## Case No. 8,448.

### LOCKINGTON v. SMITH.

[Pet. C. C. 466.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1817.

WAR—ALIENS RESIDENT IN COUNTRY—POWER TO ARREST — REGULATIONS — PLEADING AT LAW—MATTERS SUBSEQUENT TO PLEA—FORMAL OBJECTIONS.

1. Powers of the president of the United States, under the act of congress relative to alien enemies. [1 Stat. 577]. This act having authorised the president to direct the confinement of alien enemies, necessarily conferred all the means for enforcing such orders as he might give in relation to the execution of those powers.

2. The marshals of the several districts, are the proper officers to execute the orders of the president, under the act relative to alien enemies.

3. It is to the department of state, that a reference must be made for the official acts of the president, in relation to such public measures as are not immediately connected with the duties of some other department.

[Cited in brief in Collins v. State, 8 Ind. 351.]

4. The president may direct some other department to make known such measures as he may establish.

5. After the president had established such regulations as he deemed necessary in relation to alien enemies, it was not necessary to call in the aid of the judicial authority, on all occasions to enforce them, and the marshal could act without such authority.

6. By the provisions of the law, congress intended to make the judiciary auxiliary to the executive in effecting its great objects; and each department was to act independently of the other, except that the former was to make the ordinances of the latter the rule of its decisions.

[Cited in Re Spangler, 11 Mich. 323.]

7. A plea, which states matters which occurred subsequent to the institution of the suit, is bad on demurrer.

8. When objections, merely formal are stated as causes of demurrer, the party taking them is entitled to the benefit of such exceptions, when they are well founded.

At law.

WASHINGTON, Circuit Justice. This is an action of assault and battery, and false imprisonment, to which the defendant has put in four special pleas of justification. The first sets forth in substance, that at the time when the alleged wrongs were committed, viz. on the 9th of October, 1813, the defendant was marshal of this district. That war had been declared by the government of the United States against the United Kingdom of Great Britain and Ireland, which had been duly proclaimed by the

[1] [Reported by Richard Peters, Jr., Esq.]

president. That in conformity with an order of the president, requiring the subjects of the enemy residing within the United States to report themselves to the marshal of the state in which such aliens resided, the plaintiff, on the 18th day of July, 1812, reported himself to the defendant as an alien and a subject of the king of the United Kingdoms, &c. and a merchant; and the plea avers, that the plaintiff at the time when, was an alien enemy subject of the said king, aged above twenty years, residing in the state of Pennsylvania within forty miles of tide water, engaged in commerce, and was not naturalized, nor had he made application to any court of the United States to be naturalized. The plea then proceeds to set forth sundry orders issued from the department of state, by the directions of the president, of which public notice was given; as also certain instructions to the respective marshals, issued from the same department, and also from that of the commissary general of prisoners, by order of the president, the most material of which are as follows: The order of the 23d of February, 1813, required all alien enemies residing within forty miles of tide water. forthwith to apply to the marshal of the district in which they resided, for passports to retire to such places beyond that distance from tide water as should be designated by the said marshal; which order was accompanied by instructions to the marshals, of the same date, requiring them to take into custody and convey to the place assigned to them, all those to whom the said order had reference, who were engaged in commerce, and who did not immediately conform to said order. Also the instructions of the 12th of November, 1813, requiring the several marshals to offer for execution to every alien enemy within their respective districts who had been or might be thereafter removed from the vicinity of tide water, a parol of honour in a prescribed form; and if refused, commanding them to place every alien enemy so refusing, forthwith in close confinement; also, a subsequent order of the 17th of the same month, instructing the marshals not to liberate any person imprisoned under the above order of the 12th, without the special order of the commissary general. The plea then proceeds to aver, that on the 13th of March, 1813, the plaintiff received from the defendant a passport to retire to Reading, a place beyond forty miles from tide water, to which place he did retire, and remained there for some time, but that he afterwards left it contrary to the above regulations, and was found by the defendant at large in the city of Philadelphia: and being required by the defendant to return to Reading, which he refused to do, the defendant gently laid his hands on the plaintiff in order to take him into custody, that he might be conveyed to Reading; and that for this purpose the defendant necessarily imprisoned the plaintiff in the debtors' apartment, the usual and lawful place of confinement for persons taken into custody by the marshal under the authority of the United States.

The plea then states two unsuccessful attempts of the plaintiff to obtain his discharge, under writs of habeas corpus, the one issued by the chief justice of Pennsylvania, and the other by the supreme court of that state, and proceeds to aver, that the defendant, on the 20th of November, 1813, in obedience to the above recited order of the 17th of the same month, tendered to the plaintiff the parol of honour therein prescribed, which the plaintiff refused to execute; in consequence whereof the defendant held the plaintiff in confinement until the 19th of April, 1814, when he signed the parol and was discharged.

The second plea resembles the first. except that it omits to mention the writs of habeas corpus; and it sets forth an order issued from the department of the commissary general, by the directions of the president, dated the 19th of April, 1813, instructing the several marshals, in any case where an alien enemy should declare his adherence to the enemy and a disposition to support their interest, or who should attempt to disturb the confidence reposed in their government by the citizens of the United States, to place him immediately in close confinement. This plea then avers that the plaintiff at different times. before and during his confinement, was chargeable with actual hostility towards the government of the United States, and with other crimes against the public safety, by declaring his adherence to the enemy, and by declaring his intention to escape from his said restraint and to join the enemy; and by declaring that he corresponded with the subjects of the enemy, and had intercourse with them; whereupon the defendant, having the warrant of the president therefor, gently laid his hands on the plaintiff, and then and there arrested and confined him in the debtors' apartment aforesaid, and there continued him until the 19th of April, 1814, when he signed a parol to return to Reading, when he was discharged.

To the two first pleas demurrers have been filed, and various causes assigned; the whole of which may be included under the following heads: First, that the act of congress of the 6th of July, 1798, respecting alien enemies, did not authorise the president to direct the restraint or confinement of such persons for any other purpose than that of removing them from the United States; and that the orders of the president could give no authority to the marshal to confine an alien enemy, unless the marshal was also armed with a special warrant from the president for the removal of such alien from the United States. Second, that if the president had a power to order alien enemies to be confined for any other purpose, still such order must have been made by

some public act of his own, and under his seal, of which the orders issued from the department of state, and from that of the commissary general, are no evidence. Third, that the marshal was not justified in arresting and confining the plaintiff without the sanction of the judicial authority, under the second section of the above act of congress. The fourth objection is to the form of these pleas.

Issues in fact are joined on the third and fourth pleas, and need not be noticed at this time. The three first heads of objection to the defence asserted by these pleas, were so fully discussed, and, to my mind, so satisfactorily decided by the chief justice of the supreme court of this state, upon the habeas corpus obtained by the plaintiff, that I deem it unnecessary to go at large over the same ground, but I shall content myself with a brief expression of the reasons upon which my opinion is founded.

First, the power of the president under the first section of the law, to establish by his proclamation or other public acts, rules and regulations for apprehending, restraining, securing, and removing alien enemies, under the circumstances stated in that section, appears to me to be as unlimited as the legislature could make it. He alone is authorised to direct the conduct to be observed on the part of the United States towards such alien enemies, and to prescribe the manner and degree of restraint to which they should be subject; to declare in what cases, and on what terms, their residence should be permitted, and to provide for the removal of those whom he should not permit to remain in the United States, and who should refuse or neglect to depart; and, to avoid all doubt as to the extent of his power, he is authorised in general and unqualified terms, to establish any regulations which he should think necessary in the premises, and for the public safety. There is not, I think, the slightest ground for the argument, that every restraint or confinement of an alien enemy is unauthorized by this law, unless it be made with a view to his removal from the United States. If this be the true construction of the act, it would follow that, however dangerous it might be, under any supposed circumstances, for alien enemies to quit the United States, possessed of information useful to the enemy, and detrimental to this nation, they must nevertheless be either sent away, or be suffered to go at large, protected spies in the service of the enemy, and possibly in the vicinity of their armies and navy. That the legislature intended to confine the government to the choice of one of these alternatives, when a middle and safe course was at hand and evidently in its view, is not to be presumed; nor can such a construction, in my opinion, be fairly made from the words, or from the professed object of the law. It would narrow the meaning of expressions as unqualified as could well be employed, contrary to reason and the most obvious policy of the law. It seems perfectly clear, that the power to remove was vested in the president, because, under certain circumstances, he might deem that measure most effectual to guard the public safety. But he might also cause the alien to be restrained or confined, if in his opinion the public good should forbid his removal. If then the president was authorized to direct the confinement of alien enemies, without intending to remove them, I am of opinion that the powers vested in him, necessarily conferred all the means of enforcing his orders; and since it would be absurd to suppose that the president could personally enforce his own decrees, it follows that he might direct others to do it; and what officer of the government could, with so much propriety, be clothed with this authority, as the marshals of the several districts? The third section of the law applies to the single case of a removal from the United States, in which case the marshal, by the express provisions of that section, is to act under the warrant of the president: But, in all other cases coming within the provisions of this law, the authority of the marshal to carry into execution the regulations and orders of the president, is implied in the power conferred on the president to establish these regulations.

Second. The next objection to the substantial merits of the defence, is, that the orders issued from the department of state and from that of the commissary general, are not to be considered as the public acts of the president. The department of state is one of the organs of the executive branch of the government, established for the purpose of facilitating and conducting the operations of that branch, so far as the duties assigned to it extend. The business of that department is by law to be conducted in such manner as the president may direct. It is to this department that a reference must be made, for the official acts of the president in relation to those public measures which he may establish, and which are not more immediately connected with the duties of some other department. This has been the general practice of this branch of the government, and is fully warranted by law. Nevertheless, the president for the more easy and expeditious discharge of his executive duties, may direct some other department to make known the measures which he may think proper to establish. They are equally his acts, whether they emanate from the department of state, or from any other department. This much I have thought proper to say upon the general question, independent of the aid to be derived from averments in the pleading. For, in this case it is to be observed, that the pleas expressly aver that the orders and instructions issued from the department of

state, and from that of the commissary general, were the orders and instructions of the president, communicated by those departments, respectively, and these averments are acknowledged by the demurrer to be true. There can therefore be no ground for the argument that the president had no authority to delegate his powers to the department just mentioned; because, in fact, he has not done so. As to the necessity of a seal, to give validity to the orders of the president, it is I think a sufficient answer, that there is no law or usage which requires it.

Third.—It is, in the next place contended, that after the president has established such regulations as he may think necessary, the judicial authority must in every instance be resorted to to enforce them, and that the marshal can act only under such authority. Such a construction would, in my opinion, be at variance with the spirit as well as with the letter of the law, the great object of which was to provide for the public safety, by imposing such restraints upon alien enemies, as the chief executive magistrate of the United States might think necessary, and of which his particular situation enabled him best to judge. It was certainly proper, and, in many cases it might be highly beneficial to the public safety, to vest in the judiciary a power to enforce the ordinances of the president, in every case which should be regularly brought before it. But to bring this power into action, there must be a specific complaint against some particular individual, and a regular hearing of each case must be had. If no person will take upon himself the task of becoming an informer, at all times and under any circumstances an unpleasant one, is the public safety to be jeoparded, however imminent the president may know the danger to be? Certainly, this never could have been the intention of the legislature. If only judicial interference can be resorted to, it is most obvious that the means are altogether inadequate to the end for which the law meant to provide. But how can a construction so narrow as that contended for, consist with the unlimited powers conferred on the president? If he could not direct the marshal to confine alien enemies who should refuse to retire to any place which might be designated, or who should declare their adherence to the enemy, and a disposition to support their interests, can it be said that he possesses the power to direct the conduct to be observed on the part of the United States towards alien enemies, and the manner and degree of their restraint, and to establish any other regulations he might think proper in the premises, for the public safety? If he is confined to regulations which require the interposition and aid of the judiciary to give them effect, then this restriction of his authority must be deduced by mere construction from expressions as unqualified as the legislature could have used. I do not feel myself authorised to impose limits to the authority of the executive magistrate which congress, in the exercise of its constitutional powers, has not seen fit to impose. (Nothing in short, can be more clear to my mind, from an attentive consideration of the act in all its parts, than that congress intended to make the judiciary auxiliary to the executive, in effecting the great objects of the law; and that each department was intended to act independently of the other, except that the former was to make the ordinances of the latter, the rule of its decisions.)

Fourth. The principal objection assigned as cause of demurrer to the form of these pleas, is, that they are redundant, immaterial, and not traversable; the first plea, in stating the several applications of the plaintiff to be discharged on habeas corpus, and matter which occurred after the commencement of this action;—the second plea, in stating matters which occurred after the commencement of the action. These objections are, I think, well founded. The habeas corpus, and the proceedings consequent thereon, are totally immaterial and irrelevant to the matter in issue. Whether the plaintiff was discharged under them or was remanded, could neither justify or criminate the defendant, who is called upon to answer for an unlawful arrest and imprisonment of the plaintiff. If he acted without legal authority, the decision of the judge upon the writ of habeas corpus could not justify him. This objection however, is applicable only to the first plea. But both pleas are chargeable with the objection, that matter is pleaded which occurred after the commencement of the suit, which is, of course, immaterial, and could not be traversed. This action was brought, returnable to the April term of 1814, and the process was served on the 7th of December, 1813, preceding, and both pleas state, that on the 19th of April, 1814, the plaintiff gave his parol when he was discharged, and returned to Reading, where he continued until the end of the war. The second plea in particular alleges, that both before and during the plaintiff's confinement, he was chargeable with actual hostility towards the government of the United States; and it aims to justify the continuance of his confinement under the order of the 19th of April, 1813, issued from the department of the commissary general. Now it was clearly immaterial whether after this action was commenced, the defendant was or was not justified in holding the plaintiff in confinement. That was a matter which the jury could not inquire into if it had been traversed, and consequently it was improperly made a part of the pleas. It is not pleasant to decide causes on objections merely formal; but, when they are stated specially as causes of demurrer, the party is,

entitled to the benefit of his exceptions, when they are well founded. Demurrer allowed.