Ex parte RISSE.

In re STALLFORTH.

(District Court, S. D. New York. February 17, 1919.)

1. HABEAS CORPUS ⬤═85(1)—APPREHENSION OF ALIEN ENEMIES—BURDEN OF PROOF.

Under Rev. St. § 4067 (Comp. St. 1916, § 7615), authorizing the apprehension of alien enemies in time of war, the proceedings are necessarily summary, and on habeas corpus by one apprehended thereunder on a presidential warrant the burden is on petitioner to show illegal restraint, by satisfying the court that he is not a "native, citizen, denizen, or subject of a hostile nation or government."

2. HABEAS CORPUS ⬤═85(1)—APPREHENSION OF ALIEN ENEMIES—EVIDENCE.

Evidence in a habeas corpus proceeding *held* insufficient to establish the claim of petitioner, apprehended as an enemy alien, that he was a citizen of Mexico, where he was born, of German parents, and not a German subject.

Application of Estabana M. Risse for writ of habeas corpus for release of Federico Stallforth. Writ denied.

Max D. Steuer, of New York City (Theodor Megaarden, of New York City, of counsel), for relator.

Francis G. Caffey, U. S. Atty., and Rufus W. Sprague, both of New

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

York City (Robert P. Stephenson, Asst. U. S. Atty., of New York City, of counsel), for the United States.

MAYER, District Judge. This is a writ of habeas corpus to inquire into the cause of the restraint of Federico Stallforth, to which a return has been made alleging that Stallforth is held in custody pursuant to a warrant dated January 18, 1918, issued by the Attorney General by order of the President. Stallforth is held by virtue of this warrant, issued under rules and regulations made by the President in his proclamation of April 6, 1917, regarding alien enemies, pursuant to section 4067 of the Revised Statutes (Comp. St. 1916, § 7615). The traverse to the return denies that Stallforth was arrested pursuant to such warrant, and alleges that he is not an alien enemy, but a citizen of Mexico.

Testimony has been taken on the issues raised by the return and traverse. It is contended by the government that the writ should be dismissed upon the return, the traverse, and the production in evidence of a certified copy of the warrant issued in this case, marked "Exhibit 6." (1) under the authority of United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040; and (2) because Stallforth (hereinafter called relator) has not shown by the evidence that he is not a German alien enemy.

The statute under which Stallforth is held was passed July 6, 1798 (1 Stat. 577, c. 66), and is as follows:

Rev. St. § 4067: "Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States, by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being males of the age of fourteen years and upward, who shall be within the United States, and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed, as alien enemies. The President is authorized, in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject, and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety."

The only change made in the statute, since its adoption, was on April 16, 1918 (40 Stat. 531, c. 55 [Comp. St. 1918, § 7615]), when the word "males" was eliminated.

The purpose of this (to us) ancient statute is clear and simply expressed. During the present war it has been found a necessary and effective aid to the arm of the executive; and the plenary and comprehensive character of the executive's power is interestingly discussed by Mr. Justice Washington in Lockington v. Smith, 15 Fed. Cas. 758, No. 8,448. Curiously, few cases interpreting the statute are to be found, and therefore this case in some aspects is one of first impression.

Because the case can be disposed of on other grounds, I pass by the

first point of the government; i. e., that, as the executive officers, acting under the direction of the President, have jurisdiction to determine who is an alien enemy, their decision on any question of fact relating thereto is final.

[1] At the outset, it is important to determine whether the burden is on the relator or the government, the one of proving that he is not an alien enemy, the other that he is. The statute was enacted to safeguard the country in war time. It was necessarily summary. It would have been ineffective if, prior to apprehension, the fact as to enemy alienage were made the subject-matter of judicial proceedings or determination.

It must be presumed that the President has acted lawfully and that the relator is properly in custody; and, of course, as the President cannot himself physically act in every case, those who act for him represent him. Hence the warrant of arrest is the presidential warrant, and the arrest is the presidential act. The burden is therefore on relator to show illegal restraint, and, on habeas corpus, he must satisfy the court that he is not a native, citizen, denizen, or subject of the hostile nation or government. In this case, the question is not whether Stallforth is a subject of the republic of Mexico, but whether he is not a native, citizen, or subject of Germany.

[2] Concededly, Stallforth was born in Parral, Mexico, on April 4, 1882, where his parents were then residing. His father, Bernardo Stallforth was born in Germany, but went to Mexico in 1861, where he established a banking and mercantile business in 1862, which is still in existence. When Stallforth was 5 years old, his mother died, and later his father married again. Of the two marriages there were in all eight children, six of whom are living. In 1893, when Stallforth was 11 years old, his father, stepmother, and the children started from Mexico for Germany. The father died at Chicago en route, and thus never reached Germany. The stepmother and children, however, proceeded in due course with the journey, arrived at Wiesbaden in Prussia, and the stepmother established her domicile there, and has continued that domicile to the present time. Stallforth went to school in Germany until 1901, and then went to Bremen, being employed in the mercantile house of Stallforth & Eggers, to obtain a mercantile training; his stepmother and brothers and sisters remaining in Wiesbaden. The Stallforth of Bremen was his father's second cousin.

After remaining in Bremen for about half a year, Stallforth became ill and returned to Wiesbaden, where he was operated upon. Thereafter he attended the Universities of Bonn and Munich until he was about 23; i. e., 1905. Prior to 1907, Stallforth married a woman of German birth, but, according to his testimony, he could not marry in Germany, because he was not a German subject, and could not produce papers to show citizenship elsewhere, and therefore he was married in England. The visit to England was brief, and he returned with his wife to Munich (which was her home), and he made his home there. In 1907 he went with his wife to Mexico, via New York, and took over his father's business at Parral. He returned to Munich, and was there in 1908, when his first child was born. Between 1907 and 1910, he

seems to have gone back and forth between Europe and Mexico, going to Germany, France, and England. During that period he was also in the United States on a number of occasions. He has not been abroad since the spring of 1910. From that time, until late in 1912 or early in 1913, he was at Parral, but left because of the revolution in the state of Chihauhau, and went to El Paso, Tex., where he remained for a year. In 1913 he came to New York City, where he established his business office and took up a residence, first in New Jersey, and later in Westchester county. On April 6, 1917, he was taken into custody and has thus remained, except while at large on parole from the spring of 1917 until January, 1918. Other acts and statements of Stallforth will be referred to in the relevant connection.

It is contended for Stallforth, inter alia: (1) That he is a citizen of Mexico, because he was born in Mexico of Mexican parents; and (2) that, because of his birth in Mexico, he is a citizen of Mexico, even though his father may have been a German subject.

1. It will be assumed, for the purpose of the argument, that Stallforth's father acquired real estate in Mexico, and it is not controverted that he had children born to him in Mexico. It may also be assumed, for the purpose of argument on this point only, that under the German law, because of more than 10 years' continuous residence, Stallforth, Sr., had lost his German citizenship. The Constitution of Mexico provides as follows:

"Art. 30. The following are Mexicans:

"I. All those born, within or without the republic, of Mexican parents.

"II. Foreigners who are naturalized in conformity with the laws of the federation.

"III. Foreigners who acquire real estate in the republic, or have Mexican children, provided they do not declare their intention to retain their nationality."

In conformity with these constitutional provisions, the Congress of the United States of Mexico decreed the following as part of the law concerning aliens and naturalization:

"Chapter I.—Mexicans and Aliens.

"Article I. The following are Mexicans: * * *

"X. Aliens acquiring real estate in the republic, provided they do not declare their intention of retaining their nationality. At the time of making the acquisition the alien shall declare to the officiating notary or judge whether he does or does not wish to acquire Mexican nationality as granted him by section III of article 30 of the Constitution, and the alien's decision on this point shall appear in the document.

"If he chooses Mexican citizenship, or if he omits making any declaration on the subject, he may, within one year, apply to the department of [foreign] relations, in order to comply with the requirements of article 19, and be deemed a Mexican.

"XI. Aliens having children born in Mexico, provided they do not prefer to retain their alien character. At the time of registering the birth, the father shall declare his decision on this point before the judge of civil registration, and such decision shall appear in the document itself; and if he elects to acquire Mexican citizenship, or if he omits making any declaration on the subject, he may, within one year, apply to the department of [foreign] rela-

tions, in order to comply with the requirements of article 19, and be deemed a Mexican.

"XII. Aliens serving the Mexican Government in an official capacity.
* * * "

This section is immaterial to the controversy, but is mentioned, so that references infra to this pararaph XII will be understood.

Chapter III, art. 19:

"Art. 19. Aliens who come under the provisions of sections X, XI, and XII of article 1 may petition the department of [foreign] relations for their certificate of naturalization within the period fixed by those sections. They shall annex to their petition a document proving that they have acquired real estate, or that they have had children born to them in Mexico, or that they have accepted some public position, as the case may be. They shall present, moreover, the renunciation and promise required by articles 14 and 16, as a preliminary to naturalization."

Articles 14 and 16: These provisions require renunciation of foreign allegiance and promise of obedience to the laws of Mexico.

Chapter V, art. 1:

"Art 1. Aliens who have acquired real estate, who have had children born to them in Mexico, or who have held any public office, being those referred to in sections X, XI, and XII of article 1 of this law, are bound to declare within six months after the promulgation of this law, provided they have not done so previously, to the civil authorities of their place of residence whether they wish to acquire Mexican citizenship or to retain their own. In the former case they must immediately ask for their certificate of naturalization in the form prescribed in article 19 of this law. If they fail to make the declaration in question, they shall be considered Mexicans, except in those cases where there has been an official declaration on this point."

The law referred to supra was promulgated by President Diaz on May 28, 1886.

There is no evidence that Stallforth's father made the declarations required by (a) chapter I, art. 1, pars. X and XI; or (b) submitted the petition referred to in chapter III, art. 19; or (c) failed to make the declaration provided for in chapter V, art. 1.

Possibly this proof can be supplied by testimony on a commission to Mexico; but this record is barren of such proof. It cannot, therefore, be assumed or presumed that Stallforth's father was a citizen of Mexico.

The following certificate is in evidence:

"[Seal of Secretary of Foreign Relations of Empire of Mexico.]

"The citizen general of division Candido Aguilar, Secretary of State, and the office of foreign relations: Certifies that Mr. Federico Stallforth has duly proved before this office to be the son of foreign parents, to have been born in the territory of this nation and as it is embodied in the subsection 2 of the second article of the existing law of foreigners and naturalization, and therefore conforming with the said law, the mentioned Mr. Stallforth has the Mexican nationality.

"The present has been given out at the request of the interested party, and for the legal uses for which he may need it, in the city of Mexico on the 28th day of February, 1918.                                    G. Aguilar.

"[Seal of Secretary of Foreign Relations.]

"The undersigned, the Mexican ambassador, certifies that the above signature is the one of General Candido Aguilar, who was the secretary of foreign relations of my government the 28th day of February of last year.

"Washington, D. C., Jany. 9th, 1919.                               G. Bouillas.

"[Seal of Mexican Embassy at Washington, D. C.]"

From the foregoing, it appears that relator was the son "of foreign parents." On its face, this means that the parents were not Mexican citizens. It may mean parents of foreign birth who have become Mexican citizens, but it does not so state, and this court cannot speculate. If anything, the inference is that the parents were still foreigners under the Mexican law, and that the father had not complied with the provisions of the Mexican law above quoted. It must therefore be concluded that the evidence fails to show that Stallforth's father was a Mexican citizen.

2. Chapter I, art. 2, par. II, of the Mexican law provides:

"II. The children of an alien father, or of an alien mother and unknown father, born in the national territory, until they reach the age at which, according to the law of the nationality of the father or of the mother, as the case may be, they become of age. At the expiration of the year following that age they shall be regarded as Mexicans, unless they declare before the civil authorities of the place where they reside that they follow the citizenship of their parents."

From 11 up to at least 22 years of age, relator lived in Germany. Whether or not he made the declaration necessary to retain the German citizenship of his parents rests on his unsupported testimony. In effect, his testimony is that he did not, although statements he made, as will appear later, create a doubt as to credibility. In justice to relator, I do not characterize his testimony as not true. I shall simply point out contradictions which prevent the court from being fully satisfied. What is meant by "civil authorities of the place where they reside"—i. e., whether in this case in Germany, where relator physically was, or in Parral, which had been his home—does not appear.

Foreign laws are facts, which must be proved, like other facts. Ordinarily their meaning is elucidated by the decisions of courts, or the practice of administrative officers, or the testimony of experts learned in the law; but there is no such enlightenment in this case, and in such circumstances this court cannot construe the law of Mexico.

If Parral is meant, then proof on this point may be obtainable by commission. If Germany is meant, then relator confronts difficulties of proof at this time for which our government is not responsible.

The law of June 1, 1870, of the North German Confederation provides:

"Sec. 3. The legitimate children of a North German acquire the citizenship of the father by birth, even when they are born abroad. * * *"

"Sec. 13. Citizenship shall henceforth be lost only: * * * (3) By ten years' residence abroad. * * *"

"Sec. 21. North Germans who leave the territory of the Confederation and reside abroad ten years uninterruptedly lose their citizenship thereby. The aforementioned period is to be calculated from the date of leaving the territory of the Confederation, or, if the emigrant is in possession of a passport or certificate of nativity, from the time of the expiration of these papers. The period is interrupted by registration in the register of a consulate

of the Confederation. It begins anew from the day following cancellation from the register. * * *

"North Germans who have lost their citizenship by a ten years' residence abroad and have acquired no other citizenship may recover their citizenship in their former native state even without settling there.".

Except for the 10-year provision, it is plain that Stallforth, under section 3, was born a citizen of the North German Confederation. Up to 22 years of age he might, as between him and Mexico, become a Mexican citizen; but, as between him and the North German Confederation, he could only lose his German citizenship if, at the time of his birth, his father had lost his citizenship in the North German Confederation.

If the law of the North German Confederation supra operated on Stallforth, Sr., then there is no proof as to the date of the expiration of his passport or certificate of nativity; but, more important, there is no proof that he did not recover his citizenship as he was privileged to do "without settling" again in his native state.

But, whatever may be the correct construction of the law of June 1, 1870, it is probably true that as to those who left Germany before 1871 (when the law became effective) there were in addition laws containing provisions as to citizenship which might require consideration with the aid of expert testimony, in order to determine whether or no Stallforth, Sr., was a citizen of Germany in 1882 when relator was born. This is demonstrated by section 25 of the Law of June 1, 1870, which draws a distinction between two classes of citizens of the North German Confederation, as follows:

"With regard to the citizens of those states of the Confederation according to whose laws citizenship was lost by a residence abroad of ten years or longer, and who are residing abroad at the time this law is enacted, the period in question shall not be interrupted by this law.

"With regard to the citizens of the remaining states of the Confederation the period mentioned in section 21 shall begin on the day this law goes into effect."

The result of all the foregoing is: (1) That, on the facts, this court cannot conclude that Stallforth, Sr., as a fact had lost his German citizenship prior to his son's birth; and (2) that this court, in the absence of German court or administrative decisions or expert testimony, cannot determine the status of relator's father in respect of his German citizenship as of April 4, 1882, the date of relator's birth. The fact that relator's younger brother, Alberto, became naturalized in Prussia, is no proof that he or relator was not a German citizen. The certificate of naturalization merely recites that Alberto was born in Parral, Mexico, and there is no evidence that all of the facts as to the birth and citizenship of Stallforth, Sr., were laid before the official body—Vormundschaftgericht—having jurisdiction over naturalization. Indeed, all that Alberto stated to the naturalization court was that he "wanted to become a German," and, in the absence of other data, it might very well follow that the naturalization court or official would assume that a man born in Mexico was a foreigner and a proper applicant for naturalization.

There are some further interesting questions of law, discussion of which would seem academic, in view of what has been pointed out supra. That some state of facts existed which resulted in relator's belief that he was a citizen of Germany is well suggested by his own acts. Of course, his own belief that he was a German subject or citizen would not make him one; but a man's conduct may be such as to lead fairly to the inference that there must be facts in existence which form the basis of his belief.

Every act of relator shows that up to and after April 6, 1917—the date of the declaration of war by the United States against the Imperial German government—he assumed to be a German subject.

(a) In a letter to Col. Robertson, a friend of his, dated October 27, 1917, written in order to place facts before the American officials, he explained that in 1905 (when 23 years of age), on his return from Switzerland, he "made claims to exemption from military service" in Germany, "which was granted me, although the ground on which it was granted was stated by the authorities simply to be that of my ill health."

In his testimony before this court, he stated that he was informed by his physician that he would not be subjected to military service because of his physical condition. No claim was made by him that he was a citizen and subject of Mexico, and therefore not subject to military service under the German government.

(b) On two occasions, one in 1907 and one in 1910, when arriving in this country from abroad, the records of the immigration officials show that he was recorded in one instance as from Bavaria and in the other as from Germany. These entries are susceptible of explanation, and are not necessarily significant as part of the history of the case.

(c) On February 21, 1916, before our entry into the war, he was asked before the United States grand jury of this district, "Of what country are you a citizen?" and he answered, "German citizen, born in Mexico." On April 22, 1917, when being interrogated by then Assistant United States Attorney Sarfaty, he was asked, "By the way, you are a German citizen, are you not?" and he answered, "A German citizen, born in Mexico." His explanation of these answers is that the revolutionists in Mexico were then in control of the territory in which Parral is situated, and that they respected the property of foreigners, but not of Mexicans, and that, therefore, he felt that by asserting German citizenship his property in Parral would be protected.

These contradictions, however, make it difficult for the court to conclude that there are not in existence some facts upon which relator based his claim to German citizenship. It is not easy to understand how a statement made to an American grand jury or an American prosecuting officer would protect relator's property in a foreign country, and it is significant that the first of these statements was made in February, 1916, over a year before war was declared by the United States against Germany, and at a time when it must be assumed that relator in his intra-Mexican relations, wished to assert, as against Mexicans, his rights as a German subject.

In such circumstances, and on all the facts, it must be decided that, whatever may be relator's status, he has not satisfied the court that he

is not a German citizen or subject. To safeguard his rights (which may become important in some property or other relation), such is all that is necessary for the purposes of this writ. I do not find affirmatively that he is not a citizen of Mexico, nor do I find affirmatively that he is a citizen or subject of Germany. He may be one or both. But I do find that he has not shown that he is not a citizen or subject of Germany.

The writ will be dismissed.