Ex parte GILROY.

(District Court, S. D. New York. February 29, 1919. On Motion for Reargument, March 31, 1919.)

1. HABEAS CORPUS ☞13—APPREHENSION OF ALIEN ENEMIES—REVIEW.

Where a person is apprehended on a presidential warrant in time of war as an alien enemy, under Rev. St. § 4067 (Comp. St. § 7615), a court may inquire on habeas corpus whether or not he is in fact a "native, citizen, denizen, or subject of a hostile nation or government," since the statute provides for no preliminary hearing; but the proceeding is not further reviewable, being essentially an executive function, within the discretion of the President.

2. CITIZENS ☞13—EXPATRIATION—NATURALIZATION—ABANDONMENT BY RETURN TO NATIVE COUNTRY—TREATY.

Under the treaty of 1868 between the United States and the North German Union, providing in effect that, if a native of one country naturalized in the other shall renew his residence in the country of his birth without intent to return, he shall be held to have renounced his naturalization, and that "the intent not to return may be held to exist when the person naturalized in the one country resides more than two years in the other country," as construed by the State Department a two-year residence in Germany of a former German naturalized in this country is only prima facie evidence of abandonment of his American citizenship.

3. WAR ☞11—APPREHENSION OF ALIEN ENEMIES—EVIDENCE OF CITIZENSHIP CONSIDERED.

Petitioner, born in Germany, his father being a German, but a naturalized American citizen, held not subject to apprehension as an alien enemy, or a "native, citizen, denizen, or subject" of Germany, on the evidence, which included proof of his registration under the Selective Draft Act, his acceptance and classification as a citizen by boards which had knowledge of the essential facts, and his induction into the army, where he served until honorably discharged in December, 1918.

Application by Thomas F. Gilroy, Jr., for writ of habeas corpus on behalf of Walter Alexander. Writ granted.

Thomas F. Gilroy, Jr., of New York City, for the writ.

Francis G. Caffey, U. S. Atty., of New York City (Rufus W. Sprague, Jr., Sp. Asst. Atty. Gen., and Robert P. Stephenson, Sp. Asst. U. S. Atty., of New York City, of counsel), opposed.

MAYER, District Judge. This is a writ of habeas corpus to inquire into the cause of the detention of Walter Alexander (hereinafter called relator, or Alexander), granted upon the petition of Thomas F Gilroy, Jr., as a friend of Alexander. The return states that Alexander is

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

held in custody as a German alien enemy, pursuant to the presidential warrant duly issued under section 4067 of the Revised Statutes of the United States (Comp. St. § 7615) and the rules and regulations duly promulgated thereunder. A traverse was filed, verified by Alexander, in which he denies that he is an alien enemy as defined in section 4067, supra, and alleges that since his birth he has been a citizen of the United States and that his detention is in violation of his constitutional rights as such citizen.

At the opening of the hearing, and at its conclusion, respondent moved for a dismissal of the writ on the ground of lack of jurisdiction in the court to entertain it, and upon the ground, further, that the petition was insufficient upon its face, in that it did not state that the action of the President and of the Attorney General, acting under the executive order of the President, was arbitrary, illegal, and not in good faith, and also that on the face of the petition it appeared that Alexander is a native of Germany, not naturalized in the United States, and therefore an alien enemy, within section 4067, supra. The case is of great interest, not merely as affecting this particular relator, but as involving important questions and principles, the determination of which may prove of service some time hereafter, more especially because of the fact that the books are singularly lacking in precedents as to the construction of a statute now in existence for over 120 years.

The three main questions are (1) whether the act of the executive is reviewable; (2) whether, on the facts, relator has shown that he is not a native, citizen, denizen, or subject of Germany; and (3) whether the holding of a local board and district board that relator was eligible for service under the Selective Service Law (Act May 18, 1917, c. 15, 40 Stat. 76 [Comp. St. 1918, §§ 2044a–2044k]) is a binding adjudication.

The failure of the traverse to allege in words that the act of the executive was illegal or arbitrary is of small consequence. If such an allegation is necessary, as matter of law, leave to amend accordingly is herewith given. The petition and traverse, in effect, allege illegality, and the case is quite different in that regard from Cohen v. Edwards, 256 Fed. 964, recently decided by this District Court and filed February 7, 1919. Further, the traverse, by adopting the petition, alleges that relator's father was American-born, whereas the testimony showed that the father was a naturalized American citizen; but the circumstances as disclosed by the testimony are such that, if this involves any technique, leave is also granted to amend appropriately. In other words, it is desirable (both in the interest of the government and the relator) to decide the case on the merits, and thus avoid, if possible, further extended proceedings to correct merely formal deficiencies.

[1] 1. Section 4067 of the Revised Statutes of the United States was enacted as Act July 6, 1798, c. 66, § 1. Except for an amendment on April 16, 1918 (chapter 55), which eliminated the word "males," the statute has continued unamended and is now as follows:

"Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States, by any foreign nation or government, and the President makes public proc-

lamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being males of the age of fourteen years and upwards, who shall be within the United States, and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed, as alien enemies. The President is authorized, in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject, and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety."

The history of the enactment of this statute (too long to recite here) is interestingly and ably set forth in a document entitled "Supplemental Brief of the United States in Support of the Plenary Power of Congress over Alien Enemies and the Constitutionality of the Alien Enemy Act (Revised Statutes, §§ 4067–4070)," by Mr. Charles Warren, a former Assistant Attorney General of the United States and printed by the government printing office under date of 1918.

The purpose of the statute is self-evident and it is a necessary aid to the executive arm in case of war. The authority to the President to promulgate by proclamation or public act "the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases," is, of course, plenary and not reviewable. Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President. De Lacey v. United States, 249 Fed. 625, 161 C. C. A. 535, L. R. A. 1918E, 1011; Ex parte Graber (D. C.) 247 Fed. 882; Minotto v. Bradley (D. C.) 252 Fed. 600; Ex parte Fronklin (D. C.) 253 Fed. 984.

But the proposition advanced by the government is that, even though it can be shown beyond question that an error has been made, and that one alleged to be an alien enemy is, in point of fact, an American citizen, there can be no review, and that the decision of the executive is final. Such a contention proceeds upon a misunderstanding of the nature of the statute, and the power, extent, and limitations of review by the courts of acts done thereunder.

The statute relates to the civil power of the executive. It has no relation to the military arm, except in so far as the exercise of the civil power adjectively aids the military arm. The statute does not provide for any hearing, and necessarily so. To have required that there should have been a hearing before the executive could seize or detain an alien enemy would have defeated the protective and safeguarding objects of the enactment at the threshold. If a hearing had been provided, and the executive, after a hearing in accordance with law, had decided as a fact that a person was an enemy alien, then, of course, under abundant authority, the court would not have power to oppose its own conclusion as to the fact against that of the executive. The decisions in which the courts have declined to review the determination of executive officials have been in cases where the executive

or administrative act followed as the result of some hearing, sometimes formal, sometimes informal, but nevertheless a hearing.

The case most relied upon by the government is United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040. The argument is that the statute under which Ju Toy was excluded did not provide for a hearing, and therefore that this case is precedent for the proposition that the decision or determination of the executive branch of the government cannot be reviewed by the courts.

Counsel, however, have misapprehended the Ju Toy Case. In Act Aug. 18, 1894, being chapter 301, § 1, 28 Stat. 372, 390 (Comp. St. § 4325), it was provided:

"In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury."

The word "decision" was clearly construed as meaning some kind of hearing. On the return to the writ, the district attorney, in behalf of the United States, answered, setting up, among other things, a hearing and denial thereof by the immigration officer, an appeal to the Secretary of Commerce and Labor, and his action approving that of the immigration officer, and, in addition, the return by the district attorney, exhibited a copy of all the evidence offered upon the hearing and the orders by the immigration officer and the Secretary. Both the opinion of the court and the dissenting opinion in the Ju Toy Case clearly assume a decision after a hearing.

If there remain any doubt upon this point, that doubt was settled in Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369, in an opinion by Mr. Justice Holmes, who had also delivered the opinion of the court in United States v. Ju Toy, supra. It is unnecessary to cite other cases, such as those which arose under the Selective Service Law, wherein it has uniformly been held that there must be a hearing and that the refusal to review occurs only in certain circumstances in those cases where there has been a hearing.

The point is so strongly pressed, however, that brief references should be made to three cases referred to in behalf of the government.

In Ex parte Graber (D. C.) 247 Fed. 882, it appeared from relator's petition that he was an alien enemy. Relator sought release by habeas corpus on the ground that he had done nothing and contemplated doing nothing forbidden by the President's proclamation. In other words, Graber, an alien enemy, sought to review the executive decision that he should be confined or restrained. The court held that such decision was not reviewable, and with this conclusion I fully agree; but no question was involved as to whether or no relator was, in point of fact, an alien enemy.

In Minotto v. Bradley (D. C.) 252 Fed. 600, the court, inter alia, held to the same effect as in Ex parte Graber. In the Minotto Case the status of relator was involved and the court examined the question and decided upon the issues thereby presented. There was no suggestion that the court had not power to review this question as distinguished

from a review of the executive discretion in determining whether the alien enemy should be confined.

In Ex parte Fronklin (D. C.) 253 Fed. 984, the court examined into the question of fact as to whether the relator was an alien enemy, and indeed took testimony upon a hearing as in the case at bar.

Vital as is the necessity in time of war not to hamper acts of the executive in the defense of the nation and in the prosecution of the war, of equal and perhaps greater importance, is the preservation of constitutional rights. The writ of habeas corpus is in such a real sense, one of the protections of civil rights and liberties, that it is not lightly to be laid aside. Indeed, the fact that the writ has not been suspended during this war will no doubt stand as an enduring memorial of the calm and orderly restraint of the American people, during a period of great strain and stress.

As I read Lockington's Case (1813) Brightly (Pa.) 269, and the comments of Mr. Justice Washington in Lockington v. Smith, 1 Pet. C. C. 466, Fed. Cas. No. 8,448, no question arose as to the applicability of a writ of habeas corpus to inquire; and it is sufficient to refer to Angelus v. Sullivan, 246 Fed. 54, 159 C. C. A. 280 (and many more cases could be cited), as to the view entertained in this circuit that the writ of habeas corpus is available to inquire into a detention caused by executive act.

As, therefore, the statute did not provide for a hearing, and as no hearing (quite properly) was had by the executive officials in Alexander's case, it becomes necessary to determine whether he has shown that he is not one of those who can be detained under section 4067.

[2] 2. Preliminarily, it should be pointed out that the burden is on Alexander to show that he is not an enemy alien, and not upon the United States to show that he is. This question of the burden of proof was fully discussed in a recent opinion of this court, and need not be repeated here. In re Stallforth, 256 Fed. 102, opinion filed February 17, 1919.

In considering the facts, it may be observed that, in order to arrive at the truth, each side was permitted to adduce testimony with a good deal of liberality. Some of the testimony is irrelevant upon the basic facts which determine citizenship, but is relevant upon questions of credibility.

Alexander was born on October 23, 1893, in Berlin, Germany, a son of Otto Alexander (sometimes called Otto H. or Otto Henry Alexander) and Henriette Landau. His parents were married in Germany about Christmas time in 1890, and there are now living five children of that union, all born in Germany, being Leo Willie Alexander, born September 17, 1892, Walter Alexander, the prisoner, born October 23, 1893, and three daughters, born respectively 1894, 1895, and 1897. The couple also had a son born in 1891, who died in infancy. Otto Alexander died in Berlin on April 18, 1914, and his widow and three daughters are now living there.

Alexander and his brother Leo arrived together in the United States on December 4, 1915, on the steamer Nieuw Amsterdam from Rotterdam, Holland, having reached the latter city from Berlin by way of

the Dutch border.' They traveled with American passports, which had been issued to them in November, 1915, by the American ambassador in Berlin, and which before their departure from Berlin were examined and stamped by the German authorities in Berlin, both at the local police precinct, which included their residence, and at the general police headquarters in Berlin. The passports were also examined by the German military and customs authorities at the Dutch border and again upon their arrival in New York by the American authorities.

Prior to December 4, 1915, both Leo Alexander and Walter Alexander, accompanied by their father, had visited the United States— Leo once and Walter twice; Walter being here when he was a young child of 6 or 8 years of age (about 1899 or 1901), and again when he was 10 or 12 years of age (about 1903 or 1905), staying only a short time on the first trip, of which the young men remember little or nothing, and on the second trip (when Walter Alexander came with his father, but apparently without his brother) staying for about one month, during which time they visited the father's brother Richard at his home in Kingsbridge, New York. Beyond these trips they had never been in the United States until their arrival on December 4, 1915. Their father, Otto Alexander, was born in Breslau, Germany, on October 24, 1858, and came to the United States in 1870, residing in San Francisco from 1870 to 1880 and in New York City from 1881 until 1887, when he went to Germany. On November 17, 1879, being then 21 days over 21 years of age, Otto Alexander was naturalized as a citizen of the United States in the district court of California for the Fifteenth district, covering the city and county of San Francisco, by Judge Samuel H. Dwinnell.

The fact as to naturalization of the father was satisfactorily proved. Leo Alexander impressed me as a truthful witness. Owing to the San Francisco fire, the records were destroyed in 1906, and this record of the naturalization of Alexander, Sr., was never restored, and therefore is not available to relator. Before leaving Berlin, Leo Alexander, however, copied the capiton of his father's naturalization certificate of 1879 and the clerk's certification of 1901 in a small red-covered book in evidence. These papers were kept in a safe at the Alexander home in Berlin, and it would have been practically impossible for Leo Alexander in Berlin in 1915 to know, in any other way, the name of the judge of the California court who officiated in 1879, or the names of the clerk and deputy clerk who certified in 1901. This testimony, together with other testimony, establishes beyond doubt the fact that Alexander, Sr., was naturalized in 1879, as above stated.

In December, 1888, Otto Alexander instituted in the Supreme Court of New York County an action for absolute divorce against his wife, Bertha, whom he married in Hoboken, N. J., in 1886, and a decree of absolute divorce was entered therein in his favor in April, 1889. During the pendency of this action, in February, 1889, he was in Berlin, Germany, and his testimony was taken there by a commission before the United States consul, in which he testified, among other things, that he had resided with his wife in New York City until June 26, 1888, that he left the United States on September 22, 1888, that he was

then temporarily visiting his sister at No. 15 Bluecher street, Berlin, and intended to return to America.

On October 22, 1908, Otto Alexander applied to the State Department at Washington for and obtained a passport as an American citizen, No. 63410 of that date. In his verified application he stated, among other things, that he was born in Breslau on October 24, 1858, was naturalized as a citizen of the United States in San Francisco on November 7, 1879, before the district court of California, and that for 38 years, from 1870 to 1908, he had uninterruptedly resided in the United States in San Francisco and New York; that he was domiciled in the United States, his permanent residence being in New York City; that he intended to go abroad temporarily, and intended to return to the United States within two years.

While his petition for a passport confirms the conclusion that he was naturalized in 1879, his statements as to residence and permanent residence were not correct in a physical sense, but he may have very well intended to claim New York as his domicile, as distinguished from his physical residence.

On December 22, 1882, and again on December 21, 1892, he obtained life insurance from the Equitable Life Assurance Society of the United States, and his applications therefor show his birthplace and his various domiciles between his birth and December 21, 1892.

Including his trips to the United States with his sons, above mentioned, he seems to have been here for short periods at various times, the dates of some of which cannot be definitely fixed, but including, probably, various times between 1889 and 1912. He traveled about a good deal, and had been at Algiers, South and Central America, Honolulu, and many places on the North American continent.

The first step is to determine relator's citizenship as of the date of his birth; i. e., October 23, 1893. His father subsequently might have lost his American citizenship by reason either of treaty provisions or the act of March 2, 1907; but nothing which relator's father did or did not do after that date could deprive relator of his rights. Under section 1993 of the Revised Statutes (Comp. St. § 3947) it is provided as follows:

"All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States. * * *"

Under this act, it is entirely clear that Alexander was born an American citizen if, at the time of his birth, his father was still an American citizen. Under the treaty between the United States and the North German Union of 1868 (2 Malloy's Treaties, etc., pages 1298 and 1299), by article 4 (15 Stat. 616) it is provided:

"If a German naturalized in America renews his residence in North Germany, without the intent to return to America, he shall be held to have renounced his naturalization in the United States. Reciprocally: If an American naturalized in North Germany renews his residence in the United States, without the intent to return to North Germany, he shall be held to have renounced his naturalization in North Germany. The intent not to return may be held to exist when the person naturalized in the one country resides more than two years in the other country."

This treaty continued in force after the formation of the German Empire in 1871, and at least up to the declaration of war between the United States and Germany on April 6, 1917.

Otto Alexander was a native of Prussia, in North Germany, and thus, at the time of relator's birth, the father, Otto Alexander, had lived within the territory covered by the treaty, supra, for some three or four years. The treaty was a recognition of the right of expatriation on the part of both the United States and the North German Union. There had been a considerable amount of discussion between the United States and other countries upon this subject, and the question was definitely disposed of in the United States by Act July 27, 1868, 15 Stat. 223, c. 249; section 1999 of the United States Revised Statutes (Comp. St. § 3955) being part of this act. Its enactment followed shortly after the ratification of the treaty above referred to.

Moore, in his Digest of International Law, sets forth a number of instances and some diplomatic correspondence, which, briefly stated, demonstrates the purpose of the United States government to protect its citizens, whether American-born or naturalized, as against the acts and demands of foreign governments. Sections 2000 and 2001 of the United States Revised Statutes (Comp. St. §§ 3956, 3957), which are parts of the act of July 27, 1868, provide:

"Sec. 2000. All naturalized citizens of the United States, while in foreign countries, are entitled to and shall receive from this government the same protection of persons and property which is accorded to native-born citizens.

"Sec. 2001. Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress."

The treaty above referred to, and similar treaties with German states, are considered in section 471 of Moore's Digest, supra.

Quite a number of instances are cited where our Department of State was called upon to construe the status of some person, and the general trend of the decisions of the State Department is one of great caution in determining whether a naturalized American citizen loses his citizenship by absence from the United States and presence in the country of his birth for more than two years. In communications from Mr. Fish, Secretary of State, to Mr. Davis, the minister to Germany, dated July 30, 1875, and June 26, 1876, the position was taken that two years' residence in North Germany was merely prima facie proof of abandonment of nationality. In a communication between the same officials, dated November 5, 1875, Mr. Fish said:

"The Department has not doubted that the construction given to article 4 of the treaty by both Mr. Bancroft and yourself, viz. that a residence of two years did not of itself forfeit naturalization, but that the question of

the intent of the persons was then presented 'and to be decided according to the facts, was the correct one, and you are to be congratulated that a result has been reached which, if it does not concede all you have claimed as to the proper construction of this article, at least abandons a practice of enforcing the opposite construction which has been insisted on by the German military authorities."

Mr. Evarts, Secretary of State, in a communication to Mr. Williams, of the House committee on foreign relations, dated February 5, 1879, stated:

"While the intent to remain in the country of birth may be held to exist after two years' continuous residence, it is in reality not so held without special circumstances showing either an intent to remain permanently or the absence of all intent to return to the United States."

It must always be remembered that cases must be decided, if possible, on principle, and not to meet a particular situation.    There can be no doubt that one of the principal issues with which the North German Union was concerned in the treaty above referred to was the eligibility of persons of German birth for military service, while, on the other hand, the American government was keen to protect its naturalized citizens against subjection to that or any other laws of the North German Union which, in any manner, invaded the rights of American citizens.

Mere residence in the place of birth, therefore, as amply appears from the face of the treaty, as well as from its practical construction, is not enough to cause loss of citizenship by a naturalized American citizen.

The facts in the case must satisfy the court that the intent not to return exists, and such result, according to Mr. Evarts, must be demonstrated by special circumstances, showing either an intent to remain permanently or the absence of all intent to return to the United States.

In the case at bar, relator's father's second wife, the mother of relator, was German-born.   It is also true that relator's father represented a German insurance company; but, on the other hand, it is apparent that his business was of a character which caused him to travel to a considerable degree in various parts of the world.

Relator's father had shown his keen desire to become a citizen of the United States by becoming naturalized within a few days after he attained his majority, instead of waiting for a considerable period. Further, he had lived continuously in this country for about 17 years, during his earlier manhood, and was too young to have participated in the Franco-Prussian war.

It must also be remembered that in 1893, when relator was born, his father was 35 years of age, and therefore, if a German citizen, still subject to certain military service.   It is certainly most unlikely that relator's father wished to lose the protection of his American citizenship as against subjection to military service in Germany.   It is true that, after relator's birth, his father continued to live in Germany.   A man might very well have the intention of returning to this country after he had been abroad 3 or 4 years, and then find that his business affairs kept him in a foreign land.   While the declarations of rela-

tor's father in 1889, in the papers in the divorce suit against his first wife, are self-serving, nevertheless those declarations indicated an insistence by relator's father upon the proposition that he resided in this country. It is peculiarly significant, also, that he obtained a certificate of his naturalization from the clerk of the California court as late as 1901. The application by relator's father for a passport in 1908 is also of much weight. If his statement as to continuous residence in the United States is to be construed synonymously with domicile, then, in his application for a passport, he clearly showed that he considered the United States as his domicile. If, on the other hand, Alexander, Sr., in making the statement as to residence in his application for a passport, stated what was not true, in that he meant physical residence as distinguished from legal residence, then all the more is this evidence of the fact that it was his intention to hold his American citizenship; because, with that construction upon the language of the application, it is plain that Alexander, Sr., desired to retain his American citizenship, even at the expense of making a false statement.

Therefore, passing the testimony as to the statements to his family to the effect that he was an American citizen, all of the record acts of relator's father fail to show the intent, in October, 1893, not to return, within the principles laid down by Secretaries of State such as Mr. Fish and Mr. Evarts.

It is therefore decided that relator was born a citizen and subject of the United States.

[3] 3. It now becomes necessary to examine the acts and conduct of relator himself. Relator, with the exception of brief visits abroad, lived in Berlin from his birth. At the time of the declaration of war between Germany and Russia, he was a member of the Imperial Automobile Club, evidently a social organization. In September, 1914, he volunteered with other members of the club, in a volunteer body called "Imperial Volunteer Motor Corps," and, according to his testimony, he received no pay and furnished and maintained his own car and uniform—which latter was not the uniform of the German army. While in Berlin, he drove nurses and women of the Red Cross, and occasionally officers, about the city.

In this regard, he did no differently than many young Americans who performed similar services and works of aid and mercy in the countries of the Allies. Until October 23 or 24, 1914, when relator became 21 years of age, he was not competent to renounce his allegiance to the United States of America. In November, 1914, however, he went to Galicia, near the Eastern front. The testimony that he was on the Western front is not credited. While in Galicia he stayed at the hotel which was German Army Division headquarters and usually drove Red Cross women and nurses, and took wounded from the field to the base hospitals. On several occasions he drove the German general, who was the divisional commander, to field headquarters and carried provisions. According to his testimony, he took his orders from a member of the Automobile Club, who, in turn, received his orders from the motor corps headquarters, but he occasionally also took orders from the general. Late in December, 1914, or early in Jan-

uary, 1915, relator returned to Berlin and was dismissed from the corps because, according to his testimony, he was an American citizen.

Relator testified that in February, 1915, he went to the American embassy in Berlin, and on the first or second visit he took the oath of allegiance to the United States; but, as there is no record of that oath on file in the State Department, his testimony in that respect is disregarded.

Between February, 1915, and November, 1915, relator remained in Berlin. During that period he received a letter from the police authorities requesting him to call on them at Charlottenburg. On his visit there they requested him to join the German army, offered him German citizenship, and to promote him to a commission if his work justified it. He refused.

Early in November, 1915, he and his brother, Leo Alexander, applied to Ambassador Gerard, at Berlin, for passports to America, and after several visits obtained them. His application therefor was made out by one of the secretaries of the embassy in English, typewritten on a printed form, and contained an oath of allegiance to the United States. Upon his application, the ambassador issued a passport, No. 5609 of November 8, 1915, which was in the same form as the passport issued to his brother Leo.

He made several visits to the embassy before he obtained this passport, during one of which the secretary opened a drawer containing cards (evidently part of the embassy's card index filing system), and relator saw therein a card containing his name. His application states that he resided in the United States, "in the —— state, —— county, —— City." It also states that his father was naturalized as an American citizen in the district court of California on November 17, 1879; "certificate of naturalization being herewith produced." Ambassador Gerard stated that he did not recall the production of that certificate; that he talked with Alexander and his brother at the time the passports were issued; that the conversation was in English; that he made it a rule to ask all applicants whether they had been connected with the German army, and that his rule was to refuse passports to all who had been so connected. He stated that he would have refused to issue the passport to relator, had he been informed that relator had been so connected. The ambassador also stated that he issued passports freely to those who satisfied him of any reasonable claim to American citizenship, because Germany was seizing for her armies all men who were Germans, or "stadtlos"—that is, without nationality. The ambassador also stated that he required some evidence of American citizenship, even if slight, and that the fact that he issued this passport indicated at the time that he had some slight evidence at least of relator's American citizenship. As above stated, after this passport was issued, it was viséd by the German authorities both at Berlin and at the border.

The conduct of relator before leaving Germany must be tested and understood as of its date. The instances are numerous where children of an American father are born and brought up abroad, where the American parent lives for business or personal reasons. It was

but natural, when the European war broke out, that a young man should take on the color of his surroundings. It would, indeed, have been difficult for any American youth, brought up and educated in France or in England, not to believe that those countries were right. It would be equally difficult for a young man, brought up as relator was, to suppose, in the early days of the war, that the country in which he lived was wrong. In such circumstances, young men were animated either by high purposes, or by a spirit of sportsmanship, or both, to render useful service in the way of helping the sick and wounded, by driving ambulances and motorcars, and doing similar useful acts. In the performance of such work and duties, especially in the field, it would be natural that they would come in contact with the military authorities and be called upon or requested from time to time to render volunteer service of the character described by Alexander. There was nothing in Alexander's conduct in the early part of the war—i. e., the fall of 1914—inconsistent with his American citizenship, unless it was necessary to take an oath of allegiance to the German government under the rules and regulations of the German government or the German army. Although Alexander entered upon this volunteer work prior to his majority, he continued in it for some two or three months thereafter, and, if he took an oath of allegiance, it would be assumed that the oath would be a continuing oath, which attached to him when he reached 21 years of age.

There is no testimony in the case, adduced either by relator or the government, to inform the court whether an oath of allegiance to the German government was required of one who rendered volunteer service such as Alexander did. There are, however, two considerations which are in relator's favor, viz.: (1) The action of the German authorities; and (2) the proceedings before the local and district boards, to be referred to infra.

To any one familiar with the complete system of registration which obtained under the Imperial German government, with the arrest and detention of men claiming to be American citizens who were in Germany on visits to their relatives or trips of recreation at the outbreak of the war, it seems almost inconceivable that the German authorities would have permitted Alexander to leave their country if they had regarded him as a German citizen or subject. If it were to be assumed that at the outbreak of the war the German authorities were less rigorous toward those claiming American citizenship than perhaps to subjects of some other foreign countries, it may at least be fairly presumed that in the late fall of 1915, when Alexander and his brother left Germany, the German authorities were anxious to impress into their military service any young men of the age of these brothers, who were German citizens or subjects, and, indeed, according to Ambassador Gerard, they were seizing even those whom the German authorities regarded as without nationality.

There can be no question that the police military and customs authorities duly examined as well as stamped the passports of the brothers, and satisfied themselves that they were not German citizens or subjects. The testimony of the ambassador to the effect that Alex-

ander was regarded by the German authorities as without nationality is strong evidence of the fact that, whatever his status might be, he was, in any event, not regarded by the German authorities as a citizen or subject of the German Empire.

At this point it is desirable to call attention to the fact that relator has made some conflicting statements, principally in regard to the point as to whether he understood that his father was American-born or was a naturalized American citizen. But the somewhat unsatisfactory testimony in this regard is quite immaterial to the questions of status here under consideration.

Alexander testified that he always supposed that his father was American-born. It would be quite likely that a young man should so suppose, if his father always referred to himself as an American citizen, without further detail; but in the application to the American embassy for his passport, his father's naturalization was set forth, and therefore his testimony on this point is unsatisfactory, unless it can be presumed that in the files of the embassy office there was some record to that effect copied into the application by some embassy clerk in routine, and such presumption cannot be indulged in, in the absence of evidence in support thereof. On the other hand, there is no reason why he should not have stated the exact facts in this regard to his attorney, Mr. Gilroy, and it may be fairly inferred, as Mr. Gilroy contended, that Alexander did not know that his father was a naturalized citizen until Mr. Gilroy gave Alexander the information which he (Gilroy) had acquired in that regard. The point, however, is of no importance, except as bearing upon questions of law, especially in connection with the proceedings before and the action by the local and district boards.

This view is stated preliminarily to the recital of some facts connected with the arrival and stay of Alexander in this country. Opposite Alexander's name on the ship's manifest, the immigration inspector indorsed in pencil, "9 yrs. in U. S.; father born U. S." The inspector testified frankly and truthfully to the effect that he had no recollection of the case, and that an error might be made in an entry of this character, while an inspector was examining a large number of passengers. Alexander undoubtedly told the inspector that his father was born in the United States, but there is no basis for supposing that he stated that he himself had lived for 9 years in the United States. In October, 1916, Alexander registered as a voter at the polling place in his district. Under the column headed "Country of Nativity," opposite Alexander's name, appears the letters "U. S." From the testimony of the inspector it is plain that this entry was perfectly proper, in accordance with the practice of election officers, if Alexander stated that his father was an American citizen. Alexander evidently was not entitled to register or vote at that election, because he had not been in the state of New York for one year; but if, through ignorance of the law in that regard, which, in the circumstances, might be very likely, Alexander improperly registered, that fact has no relation to the question as to whether or not he is a German, and not an American citizen.

In due course Alexander registered under the Selective Service Law

with local board No. 159, the chairman of which was Mr. Bronson Winthrop and the secretary Mr. George Gordon Battle, both well-known and experienced members of this bar, and later Alexander verified and filed his questionnaire with the board, in which he stated that he was born in Germany and that his father was an American. He set forth fully his service in the Imperial volunteer motor corps. He did not claim any exemption on the ground that he was a German subject, but claimed deferred classification as being physically unfit because of kidney trouble.

Under date of January 24, 1918, Mr. Gilroy wrote a frank and comprehensive letter to the local board, which, in part, is as follows:

"As an associate member of the legal advisory board for district No. 120, I advised the above-named registrant in regard to his questionnaire and prepared the same in my own handwriting, and he verified it before me. He has not yet been officially classified by your board.

"This case is unique so far as I know, for which reason I call your special attention to it.

"I understand that under the Selective Service Regulations and the rulings of the Provost Marshal General, alien enemies, and even alien enemies who have taken out their first papers, are not desired in the army, no matter how long they have been residents of this country. The above-named registrant is technically and legally a citizen of the United States, having been born in Berlin, Germany, of an American father and a German mother. However, in every other aspect of his case, he is German.

"He came to the United States in December, 1915, for a temporary purpose, and has been unable to return. His mother and three sisters now reside in Germany. His father died there in 1914 or 1915, and all of his property is located there, as well as the property of his mother, brother, and sisters. He personally served in the German army for three or four months at the outbreak of the war as a volunteer auto driver, during which time he drove ambulances and staff cars for the German army in Galicia.

"At or about the time he arrived at the age of 21 years I understand he made a declaration before the United States ambassador in Berlin of his intention to retain his legal right to American citizenship. That is as near as he can tell me about it, for he has no copy of the paper he signed, and, of course, I am only stating what he tells me. In the latter part of 1915 he applied for and received from Ambassador Gerard, based upon the above declaration, a passport as a citizen of the United States, upon which he journeyed here.

"I happen to know the young man personally, and know that all his sympathies, prior to the entrance of the United States into the war, were for Germany. I know that he is sincerely desirous of not being drawn, for fear he may have to fight against his friends and his people in Germany, although he has no hesitation in saying that he would not object to being in the American army if his duties lay in some other direction. * * *

"I confess that I know of nothing in the Selective Service Regulations fitting this exact case, and that from the answers in his questionnaire, unless he is found to be physically incapacitated, he would probably be classified in class A–1; * * * but, if the theory of the Provost Marshal General's Bureau is that Germans and those of German affiliations are not desired in the American army, it seems clear to me that this young man comes within that ban for the reasons stated, and I therefore desire to submit those matters to you and to call your special attention to this peculiar situation."

﹅ In the files of the local board is a memorandum initialed by Mr. Battle, dated January 31, 1918, as follows:

"In this case the registrant and appellant is an American citizen, who lived in Germany until 1915 and served in the German army in 1914. (See letter Thomas F. Gilroy, Jr., filed herewith, dated January 24, 1918.)

"And, as will be seen from Mr. Gilroy's letter, he served in the German army for four months at the outbreak of the war as a volunteer auto driver, during which time he drove ambulances and staff cars for the German army in Galicia.

· "By the time he was 21, Mr. Gilroy states he made a declaration before the American ambassador in Berlin to retain his rights of American citizenship. Under the circumstances, he is clearly an American citizen.

"He has stated to the clerk of the board that he would like to serve in the American army if his status was made clear. It seems to the board that we have no alternative but to classify him in 1–A, and leave to the military authorities what disposition shall be made of his services if he should be inducted into the military service."

The local board decided that relator was subject to the Selective Service Law and placed him in class 1–A, the class first liable for service. On appeal to the district board, the decision of the local board was sustained. Thereafter, in due course, on May 26, 1918, relator was inducted into the American army and entrained for Camp Wadsworth, where he served until he was honorably discharged in December, 1918. In his certificate of honorable discharge, his commanding officer characterized his conduct as "excellent."

From what has been set forth supra, it is apparent that two further questions require consideration: (1) Whether, because of the doctrine of so-called double allegiance, relator so acted, after attaining majority, as to select Germany, instead of the United States, as the country of his allegiance; and (2) whether the action of the local and district boards is a binding adjudication upon the government.

(a) The question of double allegiance is well and briefly stated in Moore's Digest, vol. 3, p. 518, as follows:

"The doctrine of double allegiance, though often criticized as unphilosophical, is not an invention of jurists, but is the logical result of the concurrent operation of two different laws. In the absence of a general agreement for the exclusive application, according to circumstances, of the one or the other of such laws, the condition that actually exists is described by the terms 'double allegiance.' An undisputed example of it is furnished by the case of a child who, by reason of his parents being at the time of his birth in a foreign land, is born a citizen of two countries—a citizen of the country of his birth jure soli, and a citizen of his parents' country jure sanguinis. It is true that in such a case a double claim of allegiance potentially may not arise. For instance, the country of birth may not claim the allegiance of children born on its soil to alien parents; or the country to which the parents belong may not claim the allegiance of the foreign-born children of its citizens; or the laws of the two countries, while recognizing both sources of allegiance, may coincide in giving a preference, at least during the infancy of the child, to the one or the other source. But, if the conditions be otherwise, and the double claim actually exists, it is conceded to have a valid foundation. A conflict, however, is obviated by the rule—which is, indeed, but the practical formulation of the doctrine itself—that the liability of the child to the performance of the duties of allegiance is determined by the laws of that one of the two countries in which he actually is."

When Alexander became 21 years of age, he lived in Germany, and therefore, if Moore is right, his allegiance to Germany, because of his German birth, would be determined by the German law. It is entirely plain that the German authorities did not regard him as a German citizen, but, if anything, as a man without nationality. It is by no means clear that a person must affirmatively select his allegiance when he be-

comes of age. In questions which might arise as to property, the inquiry would doubtless be as to the conduct of a person after he became of age, and that inquiry might cover a considerable period. So, in the case at bar, where the question might arise as to which country could claim him as a subject, unless Alexander did something which indicated allegiance to Germany, between October 23, 1914, and November 8, 1915, when he swore to his application for a passport, and took the oath of allegiance to the United States, he neither lost his American citizenship nor elected German citizenship. During that period there is only one act which Alexander might have done which would have amounted to a renunciation of American citizenship and allegiance to the Imperial German government, and that was, if an oath of allegiance, contrary to his testimony, was required of him in connection with his service in the volunteer motor corps. On the contrary, every act of relator indicated his desire to avoid German military service. He must have so stated to the embassy, in view of the notation on the application for the passport:

"He and his brother have recently been notified by the German military authorities to report for service."

His coming to this country and his constant insistence that his father was a native-born American (whether in this regard he was truthful or not), his failure to claim exemption, although asking for deferred classification, and, in brief, all of his conduct, indicates the very contrary of election of German allegiance.

It is argued that his effort to escape from German military service and his claim for deferred classification, which would have resulted, in effect, in his escaping American military service, are indications of an attitude and disposition far from commendable; but we are not concerned in this case with the moral quality of relator's acts, but with his rights. The reference in Mr. Gilroy's letter that Alexander came to the United States in December, 1915, for a temporary purpose and was unable to return, is probably a correct statement of fact, but, nevertheless, not inconsistent with his American citizenship. The German authorities, to repeat, although not regarding him as a citizen or subject, had nevertheless notified him to report for military service, doubtless upon the theory that he was without nationality. To avoid this situation he left Germany and came to the United States at a time when there was no war between the United States and Germany, and with the intention, no doubt, of returning to Germany, where by appropriate action and conduct he had the right to retain his American citizenship. If it be assumed that his testimony as to registration at 18 years of age at the consulate must be disregarded, nevertheless, failure so to do did not result in loss of citizenship.

The executive order issued by the President of the United States on April 6, 1907, amending paragraph 138 of the Instructions to the Diplomatic Officers of the United States and the Regulations Prescribed for the Use of the Consular Service of the United States, reads as follows:

"*Children of Citizens Born Abroad.*—All children born out of the limits and jurisdiction of the United States, whose fathers were at the time of their

birth citizens thereof, are citizens of the United States; but the rights of citizenship do not descend to children whose fathers never resided in the United States. All children who are, in accordance with this paragraph, born citizens of the United States and who continue to reside outside of the United States are required, in order to receive the protection of this government, upon reaching the age of 18 years to record at an American consulate their intention to become residents and remain citizens, and upon reaching their majority are further required to take the oath of allegiance to the United States. (R. S. § 1993; Act March 2, 1907, § 6.)"

The sole purpose of the requirements as to registration and the oath of allegiance, supra, is to enable a person to receive the protection of the United States government. In other .words, if Alexander had been impressed into the German military service, he could not have expected the protection of this government; but the foregoing provision does not .deprive an American citizen of his citizenship because of failure to comply therewith. It follows that, on the facts and the law, Alexander did not become a German citizen or subject.

(b) Certain essential facts are before the court which were not before the local and district boards. Before these boards the claim was, in effect, that Alexander's father was a native-born American, and also that, when he arrived at his majority, "he made a declaration before the United States ambassador in Berlin of his intention to retain his legal right to American citizenship." These boards, therefore, did not in any manner decide the citizenship of Alexander from the standpoint of his status as the son of a naturalized American of German birth, who might or might not have lost his citizenship by the time Alexander was born; and, further, it may fairly be assumed that these boards considered that Alexander, when he became 21, had taken the necessary formal steps to retain his American citizenship. What, however, was decided upon a state of facts identical with those presented to this court was that Alexander's service in the volunteer motor corps and within the German lines had not resulted in his loss of American citizenship. Under the Selective Service Law and the rules and regulations duly made thereunder, a German or other alien enemy subject could not be classified in class 1–A and inducted into the American army. Sections 70 and 79 are as follows:

"Section 70.—*Reasons for and Effect of Classification.* * * *—The effect of classification in class V is to grant exemption or discharge from draft."

"Section 79.—Class V.—*Miscellaneous.* * * *

"Rule XII.—In class V shall be placed any registrant found to be * * *
"(2) an alien enemy. * * *

"Note 4.—No alien enemy residing in the United States, whether he has taken out his first papers or not, will be accepted for service. When, in the opinion of the local board, any person to be classified is an alien enemy, whether he has or has not declared his intention to become a citizen of the United States, or whether he, or some other person in respect of him, has or has not indicated a claim of exemption, he shall be placed in class V."

No matter what the conduct of an American citizen might have been, and no matter in what expressions he had indulged, he was, nevertheless, subject to military service under the Selective Service Law. On the other hand, it was obvious, and so provided, that an alien enemy was exempt from service. ·

With all the facts, therefore, before the local and district boards, those responsible bodies decided, in effect, upon the assumption of Alexander's citizenship, that there was nothing which he had done to forfeit that citizenship. We therefore have the unusual situation of a man being inducted into the army because he is a citizen of the United States, serving therein so as to gain an honorable discharge, and then being arrested and detained because he is an alien enemy, and one of the grounds for detention being that he had so acted in his relation to a foreign enemy government as to lose his American citizenship, and that ground having been definitely rejected by the executive authorities charged by statute, inter alia, with the duty of determining this very point.

Whether the determination of the local and district boards is in the first place an adjudication, and, secondly, a binding adjudication, is a novel question. Under section 4067, the executive is empowered to apprehend and detain alien enemies. Under the Selective Service Law, the executive, in raising an army from civil life, is empowered to appoint boards, who must determine, among other things, whether a person is or is not an alien enemy.

In so far as concerns the relation of the United States to an individual as to citizenship status for war purposes, I am of opinion that the decision of the local board, affirmed by the district board, is an adjudication. In so far as the same facts are before the local board as are before the court on a review of the action of the executive authorities under section 4067, I am of opinion that the adjudication is binding. Of course, there are no parties, but the determination is the same in both cases, and, although by different agencies of the executive, it is upon the same question; i. e., whether a person has shown that he is not an alien enemy subject or citizen.

It is concluded, therefore, that the question of fact as to whether Alexander swore allegiance to the German government was decided in the negative by the local board and is now conclusive. Any other conclusion would mean that the executive power with one hand could subject a man to military service with the attendant possibilities of death or injury, and with the other hand could detain and imprison him on the ground, as to status, which it rejected in requiring him to serve in its armed forces—a result which would be reached by the court only with great reluctance.

4. *Native and Denizen.*—It is further contended that Alexander was a native of Germany, within the language of section 4067, because he was born there. Such cannot be the meaning of "native," nor do I read any such definition in Minotto v. Bradley, 252 Fed. 600. In that case the court gives several illustrations of the word.

Another instance is where a man leaves the country of his birth, and by reason of absence loses his citizenship under some statute, but does not acquire citizenship in the new country. Such a person is a native of the country of birth, although no longer a citizen or subject.

A perfect illustration would be the case of a North German, who, if living here and absent from North Germany for 10 years, might, under the law of June 1, 1870, of the North German Federation, lose his

German citizenship, and, nevertheless, not have become an American citizen. Such a person would be a native of Germany, but not a citizen or subject. In re Stallforth, supra.

A child, however, protected by section 1993 of the Revised Statutes, is in no sense a native of the foreign land in which he is born for the purposes of section. 4067.

As to denizen, an apt definition is found in the Century Dictionary, as follows:

"A stranger admitted to residence and certain rights in a foreign country; in English law an alien admitted to citizenship by the sovereign's letters patent, but ineligible to any public office. The word has a similar meaning in South Carolina. * * * 'Hereupon all Frenchmen, in England, not denizens, were taken prisoners and all their goods seized for the king.' Baker, Chronicles, p. 306."

13 Cyc. 784, defines denizen as "a person in a middle state between an alien and natural born," and cites, among others, Fries' Case, 9 Fed. Cas. 825, No. 5,126, 3 Dall. 515, and Levy v. McCartee, 6 Pet. 102, 8 L. Ed. 334. It is quite evident that there is no proof that Alexander was a denizen of Germany, if such there can be.

Some other points of discussion must be passed by in this opinion, already too long; for, on the facts and the law, I hold the view that Alexander is a citizen and subject of the United States, and, in any event, that he is not a native, citizen, denizen, or subject of Germany.

Writ sustained, and relator will be discharged.

### On Motion for Reargument.

The respondent has moved for a reargument in order to present "for the consideration of the court certain facts in evidence in relation to the residence of Otto Alexander, father of the relator, Walter Alexander, in Berlin, Germany, prior to the birth of Walter Alexander, which may not have particularly come to the notice of the court."

Otto Alexander's application for insurance was before the court and no facts are now presented which were not heretofore in the record. It is true that special attention was not called to certain of the provisions of Otto Alexander's application dated November 1, 1892, to the Equitable Life Assurance Society. If I held the view that the application in question would change the result, even if construed with the translation suggested by respondent, I would, of course, hear a reargument; but there is nothing in the application which leads to a different conclusion than that heretofore announced.

The application was made in Germany on a printed form of the Equitable in the German language. In answer to the printed question, "Wohnort Stadt?" Alexander answered, "Berlin. Blumenhof 2." In the medical examination, dated November 2, 1892, there were questions on the printed form in German, and the answers of Alexander were in German. The translation of the questions and answers, as suggested by respondent, is as follows:

"I–D: Q. "Do you contemplate a change of business or occupation, and, if so, is the business of the same character?" A. "No."

"I–E: Q. "Do you contemplate a change of residence; if so, to where and for what reason (that is to say, on account of business, health, or pleasure)?" A. "No."

"I–F: Q. "How long have you lived at your present residence?" A. "Five years."

"I–G: Q. "Where have you elsewhere lived and when? (Give the place of residence and time of duration in each according to years.)" A. "Eleven years in Breslau, ten years in San Francisco, seven years in New York."

The words translated, supra, as "residence" are: In I-E, "Wohnsitzes"; in I–F, "Wohnorte"; in I–G, "Wohnort."

In Adler's German-English Dictionary, published by Appleton & Co. in 1884 (a work practically contemporaneous for translation purposes), occur the following definitions:

"Wohnort. Dwelling place, abiding place, habitation."

"Wohnsitz. Domicile, abode, residence; 'seinen wohnsitzen aufschlagen,' to settle at a place."

In this connection, the verb "wohnen" is defined as "to live, dwell, abide, reside, lodge." Examples given are: "Auf dem Lande wohnen," to live in the country. "In der Stadt wohnen," to reside in town. The noun "wohnen" is defined as "living, dwelling, lodging."

Apparently, therefore, the words used in the Equitable forms were as elastic as the English word "residence" when used by laymen; i. e., the place where a person physically lives for the time being, or the permanent abode or domicile, depending on context and circumstances.

When a person is applying for insurance, he is thinking in terms of insurance. He cannot change the printed form. He is justified in assuming, as in this case, that he is asked where he physically lived or lives, and whether he intends to make any change in his physical residence. Americans representing our business interests abroad at this very moment, who have no intention of giving up their American citizenship, would necessarily answer precisely the same way, in the same circumstances. Such persons would not think of complicated legal questions bearing on domicile and affecting their status as American citizens.

There is nothing in this insurance application which changes the essential facts as fully set forth in the record and the opinion herein, nor the law as then understood, construed and applied by the Department of State.

It is suggested that the reference in the opinion to visits to the United States, "including probably various times between 1889 and 1912," should be from about 1899, instead of 1889; but this is a point of no importance, because the status of Alexander, Sr., did not turn on the date of his subsequent visits to this country, but, to some extent, on what he did in that connection, as fully considered and stated in the opinion of the court.

Motion denied.