# LUDECKE *v.* WATKINS, DISTRICT DIRECTOR OF IMMIGRATION.

No. 723.  Argued May 3–4, 1948.—Decided June 21, 1948.

*Stanley M. Silverberg* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Samuel D. Slade* and *Melvin Richter.*

*George C. Dix* filed a brief for unnamed enemy aliens, as *amici curiae,* in support of petitioner.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Fifth Congress committed to the President these powers:

> "Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized, in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be sub-

ject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety." (Act of July 6, 1798, 1 Stat. 577, R. S. § 4067, as amended, 40 Stat. 531, 50 U. S. C. § 21.)

This Alien Enemy Act has remained the law of the land, virtually unchanged since 1798.[1] Throughout these one hundred and fifty years executive interpretation and decisions of lower courts have found in the Act an authority for the President which is now questioned, and the further claim is made that, if what the President did comes within the Act, the Congress could not give him such power.[2] Obviously these are issues which properly brought the case here. 333 U. S. 865.

Petitioner, a German alien enemy,[3] was arrested on De-

---

[1] There have been a few minor changes in wording. We have duly considered these in light of an argument in the brief of the *amici curiae* and deem them without significance.

[2] We are advised that there are 530 alien enemies, ordered to depart from the United States, whose disposition awaits the outcome of this case.

[3] The district court found that:

"The petitioner was born in Berlin, Germany, on February 5, 1890. He was out of Germany for most of the period of 1923 to March 1933. He returned to Germany in March 1933 and became a member of the Nazi party. Later he had some disagreements with other members and as a result he was sent to a German concentration camp, from which he escaped March 1, 1934, after being confined for over eight months. Sometime thereafter he came to this country and published a book, 'I Knew Hitler' ['*The Story of a Nazi Who Escaped The Blood Purge*'—'In memory of Captain Ernst Roehm and Gregor Strasser and many other Nazis who were betrayed, murdered, and traduced in their graves'], in 1937. His

cember 8, 1941, and, after proceedings before an Alien Enemy Hearing Board on January 16, 1942, was interned by order of the Attorney General, dated February 9, 1942.[4] Under authority of the Act of 1798, the President, on July 14, 1945, directed the removal from the United States of all alien enemies "who shall be deemed by the Attorney General to be dangerous to the public peace and safety of the United States." Proclamation 2655, 10 Fed. Reg. 8947. Accordingly, the Attorney General, on January 18, 1946, ordered petitioner's removal.[5] Denial of a writ of *habeas corpus* for release from detention under this order was affirmed by the court below. 163 F. 2d 143.

As Congress explicitly recognized in the recent Administrative Procedure Act, some statutes "preclude judicial review." Act of June 11, 1946, § 10, 60 Stat. 237, 243. Barring questions of interpretation and constitutionality,

---

petition for naturalization as an American citizen was denied December 18, 1939."

The petitioner's attitude was thus expressed in his brief before the district court:

"Fundamentally, it matters not where I live, for I can strive to live the right life and be of service where ever I am. Besides, it may well be a better thing to do the best I can while I can in the midst of a defeated people suffering in body and soul, than to be a futile and frustrated something in the midst of a triumphant people breathing the foul air of self-complacency, hypocrisy, and self-deceit."

[4] No question has been raised as to the validity of these administrative actions taken pursuant to Presidential Proclamation 2526, dated December 7, 1941, 6 Fed. Reg. 6321, 6323, issued under the authority of the Alien Enemy Act.

[5] The order recited that the petitioner was deemed dangerous on the basis of the evidence adduced at hearings before the Alien Enemy Hearing Board on January 16, 1942, and the Repatriation Hearing Board on December 17, 1945. The district court which examined these proceedings found that petitioner had notice and a fair hearing and that the evidence was substantial. See also note 8, *infra.*

the Alien Enemy Act of 1798 is such a statute.  Its terms, purpose, and construction leave no doubt.  The language employed by the Fifth Congress could hardly be made clearer, or be rendered doubtful, by the incomplete and not always dependable accounts we have of debates in the early years of Congress.[6]  That such was the scope of the Act is established by controlling contemporaneous construction.  "The act concerning alien enemies, which confers on the president very great discretionary powers respecting their persons," Marshall, C. J., in *Brown* v. *United States,* 8 Cranch 110, 126, "appears to me to be as unlimited as the legislature could make it."  Washington, J., in *Lockington* v. *Smith,* 15 Fed. Cas. No. 8448 at p. 760.  The very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion.[7]  This view was expressed by Mr. Justice Iredell shortly after the Act was passed, *Case of Fries,* 9 Fed. Cas. No. 5126, and every judge before whom the question has since come has held that the statute barred judi-

---

[6] See, however, *United States ex rel. Kessler* v. *Watkins,* 163 F. 2d 140; *Citizens Protective League* v. *Clark,* 81 U. S. App. D. C. 116, 155 F. 2d 290.

[7] "Such a construction would, in my opinion, be at variance with the spirit as well as with the letter of the law, the great object of which was to provide for the public safety, by imposing such restraints upon alien enemies, as the chief executive magistrate of the United States might think necessary, and of which his particular situation enabled him best to judge. . . .  I do not feel myself authorised to impose limits to the authority of the executive magistrate which congress, in the exercise of its constitutional powers, has not seen fit to impose.  Nothing in short, can be more clear to my mind, from an attentive consideration of the act in all its parts, than that congress intended to make the judiciary auxiliary to the executive, in effecting the great objects of the law; and that each department was intended to act independently of the other, except that the former was to make the ordinances of the latter, the rule of its decisions."  *Lockington* v. *Smith, supra,* at p. 761.

cial review.[8]  We would so read the Act if it came before us without the impressive gloss of history.

The power with which Congress vested the President had to be executed by him through others. He provided for the removal of such enemy aliens as were "deemed by the Attorney General" to be dangerous.[9]  But such a finding, at the President's behest, was likewise not to be subjected to the scrutiny of courts. For one thing, removal was contingent not upon a finding that in fact an alien was "dangerous." The President was careful to call for the removal of aliens "deemed by the Attorney General to be dangerous." But the short answer is that

---

[8] *Citizens Protective League* v. *Clark,* 81 U. S. App. D. C. 116, 155 F. 2d 290; *United States ex rel. Schlueter* v. *Watkins,* 158 F. 2d 853; *United States ex rel. Hack* v. *Clark,* 159 F. 2d 552; *United States ex rel. Kessler* v. *Watkins,* 163 F. 2d 140; *United States ex rel. Von Ascheberg* v. *Watkins,* 163 F. 2d 1021; *Minotto* v. *Bradley,* 252 F. 600; see *Lockington's Case,* Brightly (Pa.) 269, 280; *Lockington* v. *Smith,* 15 F. Cas. No. 8448, at p. 758; *Ex parte Graber,* 247 F. 882; *De Lacey* v. *United States,* 249 F. 625; *Ex parte Fronklin,* 253 F. 984; *Grahl* v. *United States,* 261 F. 487; cf. *Banning* v. *Penrose,* 255 F. 159; *Ex parte Risse,* 257 F. 102; *Ex parte Gilroy,* 257 F. 110; *United States ex rel. De Cicco* v. *Longo,* 46 F. Supp. 170; *United States ex rel. Schwarzkopf* v. *Uhl,* 137 F. 2d 898; *United States ex rel. D'Esquiva* v. *Uhl,* 137 F. 2d 903; *United States ex rel. Knauer* v. *Jordan,* 158 F. 2d 337. The one exception is the initial view taken by the district court in this case. It rejected the "contention that the only question that the Court may consider in this habeas corpus proceeding is the petitioner's alien enemy status, although there are cases which give suppport to that view," but held the petitioner had had a fair hearing before the Repatriation Board and that there was substantial evidence to support the Attorney General's determination that petitioner was "dangerous." On rehearing, the court noted that the *Schlueter* case, *supra,* foreclosed the issue.

[9] If the President had not added this express qualification, but had conformed his proclamation to the statutory language, presumably the Attorney General would not have acted arbitrarily but would have utilized some such implied standard as "dangerous" in his exercise of the delegated power.

the Attorney General was the President's voice and conscience. A war power of the President not subject to judicial review is not transmuted into a judicially reviewable action because the President chooses to have that power exercised within narrower limits than Congress authorized.

And so we reach the claim that while the President had summary power under the Act, it did not survive cessation of actual hostilities.[10] This claim in effect nullifies the power to deport alien enemies, for such deportations are hardly practicable during the pendency of what is colloquially known as the shooting war.[11] Nor does law

---

[10] "The cessation of hostilities does not necessarily end the war power. It was stated in *Hamilton* v. *Kentucky Distilleries & W. Co.*, 251 U. S. 146, 161, that the war power includes the power 'to remedy the evils which have arisen from its rise and progress' and continues during that emergency. *Stewart* v. *Kahn*, 11 Wall. 493, 507. Whatever may be the reach of that power, it is plainly adequate to deal with problems of law enforcement which arise during the period of hostilities but do not cease with them. No more is involved here." *Fleming* v. *Mohawk Wrecking & Lumber Co.*, 331 U. S. 111, 116.

[11] The claim is said to be supported by the legislative history of the Act. We do not believe that the paraphrased expressions of a few members of the Fifth Congress could properly sanction at this late date a judicial reading of the statutory phrase "declared war" to mean "state of actual hostilities." See p. 3, *supra*. Nothing needs to be added to the consideration which this point received from the court below in the *Kessler* case. Circuit Judge Augustus Hand, in this case speaking for himself and Circuit Judges L. Hand and Swan, said:

"Appellants' counsel argues that the Congressional debates preceding the enactment of the Alien Law of 1798 by Gallatin, Otis and others, show that Congress intended that 'war' as used in the Alien Enemy Act should be war in fact. We cannot agree that the discussions had such an effect. Gallatin argued that Section 9 of Art. I of the Constitution allowing to the states the free 'Migration or Importation' of aliens until 1808 might stand in the way of the Act as

lag behind common sense. War does not cease with a cease-fire order, and power to be exercised by the President such as that conferred by the Act of 1798 is a process which begins when war is declared but is not exhausted when the shooting stops.[12] See *United States* v. *Ander-*

---

proposed if it was not limited to a 'state of actual hostilities.' It however was not so limited in the text of the act and it is hard to see how the failure to limit it in words indicated a disposition on the part of Congress to limit it by implication. Otis objected to limiting the exercise of the power to a state of declared war because he thought that the President should have power to deal with enemy aliens in the case of hostilities short of war and in cases where a war was not declared. That Otis wished to add 'hostilities' to the words 'declared war,' and failed in his attempt, does not show that Congress meant that when war was declared active hostilities must exist in order to justify the exercise of the power. The questions raised which were dealt with in the act as finally passed were not how long the power should last when properly invoked, but the conditions upon which it might be invoked. Those conditions were fully met in the present case and no question is raised by appellants' counsel as to the propriety of the President's Proclamation of War. There is no indication in the debates or in the terms of the statute that the exercise of the power, when properly invoked, should cease until peace was made, and peace has not been made in the present case. If the construction of the statute contended for by appellants' counsel were adopted, the Executive would be powerless to carry out internment or deportation which was not exercised during active war and might be obliged to leave the country unprotected from aliens dangerous either because of secrets which they possessed or because of potential inimical activities. It seems quite necessary to suppose that the President could not carry out prior to the official termination of the declared state of war, deportations which the Executive regarded as necessary for the safety of the country but which could not be carried out during active warfare because of the danger to the aliens themselves or the interference with the effective conduct of military operations." (*United States ex rel. Kessler* v. *Watkins,* 163 F. 2d at 142–43.)

[12] It is suggested that a joint letter to the Chairman of a congressional committee by Attorney General Gregory and the Secretary of

**168**

*son,* 9 Wall. 56, 70; *The Protector,* 12 Wall. 700; *McElrath* v. *United States,* 102 U. S. 426, 438; *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 167. "The state of war" may be terminated by treaty or legislation or Presidential proclamation. Whatever the mode, its

---

Labor in the Wilson administration reflects a contrary interpretation of this Act. But, as the *Kessler* opinion pointed out: "The letter of Attorney General Gregory referred to by appellants' counsel does not affect our conclusions. When he said that there was no law to exclude aliens he was, in our opinion, plainly referring to conditions after the ratification of the peace treaty, and not to prior conditions." *Ibid.* The text of the letter (dated Feb. 5, 1919) supports that observation: "There is no law now on the statute books under which these persons can be excluded from the country, nor under which they can be detained in custody after the ratification of the peace treaty. Unless the bill introduced by you, or one similar in character, is passed it will become necessary on the ratification of peace to set free all of these highly dangerous persons." Hearings before the House Committee on Immigration and Naturalization on H. R. 6750, 66th Cong., 1st Sess., 42–43. And Attorney General Palmer made substantially the same statements to the Senate and House Committees on Immigration. See S. Rep. No. 283, 66th Cong., 1st Sess., 2; H. R. Rep. No. 143, 66th Cong., 1st Sess., 2.

But even if contradictory views were expressed by Attorney General Gregory, they plainly reflect political exigencies which from time to time guide the desire of an administration to secure what in effect is confirming legislation. The confusion of views is strikingly manifested by Attorney General Gregory's recognition that the Act survived the cessation of actual hostilities so as to give authority to apprehend, restrain, and secure enemy aliens. See, generally, World War I cases cited note 8, *supra.* In any event, even if one view expressed by Attorney General Gregory, as against another expressed by him, could be claimed to indicate a deviation from an otherwise uniformly accepted construction of the Act before us, it would hardly touch the true meaning of the statute. As against the conflicting views of one Attorney General we have not only the view but the actions of the present Attorney General and of the President and their ratification by the present Congress. See note 19, *infra.*

termination is a political act.[13]   *Ibid.*   Whether and when
it would be open to this Court to find that a war though
merely formally kept alive had in fact ended, is a question
too fraught with gravity even to be adequately formu-
lated when not compelled.   Only a few months ago the
Court rejected the contention that the state of war in
relation to which the President has exercised the authority
now challenged was terminated.   *Woods* v. *Miller Co.,*
333 U. S. 138.   Nothing that has happened since calls
for a qualification of that view.[14]   It is still true, as was
said in the opinion in that case which eyed the war power
most jealously, "We have armies abroad exercising our
war power and have made no peace terms with our allies,
not to mention our principal enemies."   *Woods* v. *Miller
Co., supra,* at p. 147 (concurring opinion).   The situation
today is strikingly similar to that of 1919, where this
Court observed: "In view of facts of public knowledge,
some of which have been referred to, that the treaty of

---

[13] Of course, there are statutes which have provisions fixing the
date of the expiration of the war powers they confer upon the Execu-
tive.   See, *e. g., Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146,
167, n. 1 (collection of statutes providing that the authority terminates
upon ratification of treaty of peace or by Presidential proclamation).
Congress can, of course, provide either by a day certain or a defined
event for the expiration of a statute.   But when the life of a statute
is defined by the existence of a war, Congress leaves the determination
of when a war is concluded to the usual political agencies of the
Government.

[14] Cf., *e. g.,* the President's address to Congress on March 17,
1948, recommending the enactment of the European recovery pro-
gram, universal military training, and the temporary reenactment of
selective service legislation.   H. Doc. No. 569, 80th Cong., 2d Sess.
On May 10, 1948, by Executive Order 9957, 13 Fed. Reg. 2503, the
President exercised his authority "in time of war, . . . through the
Secretary of War, to take possession and assume control of any
system or systems of transportation . . . ."   (Act of August 29, 1916,
39 Stat. 619, 645, 10 U. S. C. § 1361.)

peace has not yet been concluded, that the railways are still under national control by virtue of the war powers, that other war activities have not been brought to a close, and that it can not even be said that the man power of the nation has been restored to a peace footing, we are unable to conclude that the act has ceased to be valid." *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. at 163.

The political branch of the Government has not brought the war with Germany to an end. On the contrary, it has proclaimed that "a state of war still exists." Presidential Proclamation 2714, 12 Fed. Reg. 1; see *Woods* v. *Miller Co., supra,* at p. 140; *Fleming* v. *Mohawk Wrecking & Lumber Co.,* 331 U. S. 111, 116. The Court would be assuming the functions of the political agencies of the Government to yield to the suggestion that the unconditional surrender of Germany and the disintegration of the Nazi Reich have left Germany without a government capable of negotiating a treaty of peace. It is not for us to question a belief by the President that enemy aliens who were justifiably deemed fit subjects for internment during active hostilites do not lose their potency for mischief during the period of confusion and conflict which is characteristic of a state of war even when the guns are silent but the peace of Peace has not come.[15] These are matters of political judgment for which judges have neither technical competence nor official responsibility.

This brings us to the final question. Is the statute valid as we have construed it? The same considerations of reason, authority, and history, that led us to reject

---

[15] "Rapid changes are taking place in Europe which affect our foreign policy and our national security. . . . Almost 3 years have elapsed since the end of the greatest of all wars, but peace and stability have not returned to the world." H. Doc. No. 569, *supra,* at p. 1.

reading the statutory language "declared war"[16] to mean "actual hostilities," support the validity of the statute. The war power is the war power. If the war, as we have held, has not in fact ended, so as to justify local rent control, *a fortiori,* it validly supports the power given to the President by the Act of 1798 in relation to alien enemies. Nor does it require protracted argument to find no defect in the Act because resort to the courts may be had only to challenge the construction and validity of the statute and to question the existence of the "declared war," as has been done in this case.[17] The Act is almost as old as the Constitution, and it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights.[18] The fact that

[16] We should point out that it is conceded that a "state of war" was "formally declared" against Germany. Act of December 11, 1941, 55 Stat. 796.

[17] The additional question as to whether the person restrained is in fact an alien enemy fourteen years of age or older may also be reviewed by the courts. See cases cited note 8, *supra.* This question is not raised in this case.

[18] The Fifth Congress was also responsible for "An Act concerning Aliens," approved June 25, 1798, 1 Stat. 570, and "An Act in addition to the act, entitled 'An act for the punishment of certain crimes against the United States,'" approved July 14, 1798, 1 Stat. 596, as well as the instant "An Act respecting Alien Enemies," approved July 6, 1798. It is significant that while the former statutes—the Alien and Sedition Acts—were vigorously and contemporaneously attacked as unconstitutional, there was never any issue raised as to the validity of the Alien Enemy Act. James Madison, in his report on the Virginia Resolutions, carefully and caustically differentiated between friendly and enemy alien legislation, as follows: "The next observation to be made is, that much confusion and fallacy have been thrown into the question by blending the two cases of *aliens, members of a hostile nation,* and *aliens, members of friendly nations.* . . . With respect to alien enemies, no doubt has been intimated as to the Federal authority over them; the Constitution having expressly delegated to Congress the power to declare war

hearings are utilized by the Executive to secure an informed basis for the exercise of summary power does not argue the right of courts to retry such hearings, nor bespeak denial of due process to withhold such power from the courts.

Such great war powers may be abused, no doubt, but that is a bad reason for having judges supervise their exercise, whatever the legal formulas within which such supervision would nominally be confined. In relation to the distribution of constitutional powers among the three branches of the Government, the optimistic Eighteenth Century language of Mr. Justice Iredell, speaking of this very Act, is still pertinent:

> "All systems of government suppose they are to be administered by men of common sense and common honesty. In our country, as all ultimately depends on the voice of the people, they have it in their power, and it is to be presumed they generally will choose men of this description; but if they will not, the case, to be sure, is without remedy. If they choose fools, they will have foolish laws. If they choose knaves, they will have knavish ones. But this can never be the case until they are generally fools or knaves themselves, which, thank God, is not likely ever to become the character of the American people." (*Case of Fries, supra,* at p. 836.)

---

against any nation, and, of course, to treat it and all its members as enemies." 6 Writings of James Madison (Hunt, Editor) 360–61. Similarly, Thomas Jefferson, the author of the Kentucky Resolutions of 1798 and 1799, was careful to point out that the Alien Act under attack was the one "which assumes powers over alien friends." 8 Writings of Thomas Jefferson (Ford, Editor) 466. There was never any questioning of the Alien Enemy Act of 1798 by either Jefferson or Madison nor did either ever suggest its repeal.

Accordingly, we hold that full responsibility for the just exercise of this great power may validly be left where the Congress has constitutionally placed it—on the President of the United States. The Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs. He who was entrusted with such vast powers in relation to the outside world was also entrusted by Congress, almost throughout the whole life of the nation, with the disposition of alien enemies during a state of war. Such a page of history is worth more than a volume of rhetoric.[19]

*Judgment affirmed and stay order entered February 2, 1948, vacated.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join, dissenting.

The petition for habeas corpus in this case alleged that petitioner, a legally admitted resident of the United States,

---

[19] It is suggested that Congress ought to do something about correcting today's decision. But the present Congress has apparently anticipated the decision. It has recognized that the President's powers under the Alien Enemy Act of 1798 were not terminated by the cessation of actual hostilities by appropriating funds ". . . for all necessary expenses, incident to the maintenance, care, detention, surveillance, parole, and transportation of alien enemies and their wives and dependent children, including transportation and other expenses in the return of such persons to place of bona fide residence or to such other place as may be authorized by the Attorney General . . . ." 61 Stat. 279, 292. "And the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification of the action of the Chief Executive. *Brooks* v. *Dewar*, 313 U. S. 354, 361." *Fleming* v. *Mohawk Wrecking & Lumber Co.*, 331 U. S. 111, 116; see also *Isbrandtsen-Moller Co.* v. *United States*, 300 U. S. 139.

was about to be deported from this country to Germany as a "dangerous" alien enemy, without having been afforded notice and a fair hearing to determine whether he was "dangerous." The Court now holds, as the Government argued, that because of a presidential proclamation, petitioner can be deported by the Attorney General's order without any judicial inquiry whatever into the truth of his allegations.[1] The Court goes further and holds, as I understand its opinion, that the Attorney General can deport him whether he is dangerous or not. The effect of this holding is that any unnaturalized person, good or bad, loyal or disloyal to this country, if he was a citizen of Germany before coming here, can be summarily seized, interned and deported from the United States by the At-

---

[1] The Court specifically holds that this petitioner is not entitled to have this Court or any other court determine whether petitioner has had a fair hearing. The merits of the Attorney General's action are therefore not subject to challenge by the petitioner. Nevertheless the Court in note 3 quotes out of context a short paragraph from a written protest made by petitioner against the Attorney General's procedure. The only possible purpose of this quotation is to indicate that, anyhow, the petitioner ought to be deported because of his views stated in this paragraph of his protest against the Attorney General's procedure. This is a strange kind of due process. The protest pointed out that Hitler had kept petitioner in a concentration camp for eight months for disloyalty to the Nazis and that this Government had then kept him imprisoned for four years on the charge that he was a Nazi. Immediately before the paragraph cited in the Court's opinion, petitioner's protest contained the following statement:

"Far be it from me, however, to thrust my goodwill upon anybody and insist to stay on a community whose public servants of ill will seek to remove me by pitiful procedures and illegal means. Therefore, I propose that I leave voluntarily as a free man, not as a dangerous alien deportee, at the earliest opportunity provided I shall be allowed sixty days to settle my affairs before sailing date."

Is it due judicial process to refuse to review the whole record to determine whether there was a fair hearing and yet attempt to bolster the Attorney General's deportation order by reference to two sentences in a long record?

torney General, and that no court of the United States has any power whatever to review, modify, vacate, reverse, or in any manner affect the Attorney General's deportation order. MR. JUSTICE DOUGLAS has given reasons in his dissenting opinion why he believes that deportation of aliens, without notice and hearing, whether in peace or war, would be a denial of due process of law. I agree with MR. JUSTICE DOUGLAS for many of the reasons he gives that deportation of petitioner without a fair hearing as determined by judicial review is a denial of due process of law.[2] But I do not reach the question of power to deport aliens of countries with which we are at war while we are at war, because I think the idea that we are still at war with Germany in the sense contemplated by the statute controlling here is a pure fiction. Furthermore, I think there is no act of Congress which lends the slightest basis to the claim that after hostilities with a foreign country have ended the President or the Attorney General, one or both, can deport aliens without a fair hearing reviewable in the courts. On the contrary, when this very question came before Congress after World War I in the interval between the Armistice and the conclusion of formal peace with Germany, Congress unequivocally required that enemy aliens be given a fair hearing before they could be deported.

The Court relies on the Alien Enemy Act of 1798. 1 Stat. 577, 50 U. S. C. § 21–24. That Act did grant extraordinarily broad powers to the President to restrain and "to provide for the removal" of aliens who owe allegiance to a foreign government, but such action is authorized only "whenever there is a declared war between the United States" and such foreign government, or in the event that foreign government attempts or threatens the United States with "any invasion or predatory incursion."

---

[2] Compare *Ex parte Endo*, 323 U. S. 283; *Korematsu* v. *United States*, 323 U. S. 214.

The powers given to the President by this statute, I may assume for my purposes, are sufficiently broad to have authorized the President acting through the Attorney General to deport alien Germans from this country while the "declared" second World War was actually going on, or while there was real danger of invasion from Germany. But this 1798 statute, unlike statutes passed in later years, did not expressly prescribe the events which would for statutory purposes mark the termination of the "declared" war or threatened invasions. *See Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 165, n. 1. In such cases we are called on to interpret a statute as best we can so as to carry out the purpose of Congress in connection with the particular right the statute was intended to protect, *United States* v. *Anderson,* 9 Wall. 56, 69–70; *The Protector,* 12 Wall. 700, 702, or the particular evil the statute was intended to guard against. *McElrath* v. *United States,* 102 U. S. 426, 437, 438. See *Judicial Determination of the End of the War,* 47 Col. L. Rev. 255.

The 1798 Act was passed at a time when there was widespread hostility to France on the part of certain groups in the United States. It was asserted by many that France had infiltrated this country with spies preaching "subversive" ideas and activities. Mr. Otis, the chief congressional spokesman for the measure, expressed his fears of ". . . a band of spies . . . spread through the country, from one end of it to the other, who, in case of the introduction of an enemy into our country" might join the enemy "in their attack upon us, and in their plunder of our property . . . ." Annals of Congress, 5th Cong., 2d Sess. 1791. Congressional discussions of this particular measure appear at pp. 1573–1582, 1785–1796, and 2034–2035, Annals of Congress, 5th Cong., 2d Sess.,[3]

---

[3] In addition to the above discussions of the Alien Enemy Act, frequent references to the Act were made in the congressional debates

and show beyond any reasonable doubt that the Alien Enemy Act of 1798 was intended to grant its extraordinary powers only to prevent alien enemies residing in the United States from extending aid and comfort to an enemy country while dangers from actual fighting hostilities were imminently threatened. Indeed, Mr. Otis, who was most persistent in his expressions of anti-French sentiments and in his aggressive sponsorship of this and its companion Alien and Sedition Acts, is recorded as saying ". . . that in a time of tranquility, he should not desire to put a power like this into the hands of the Executive; but, in a time of war, the citizens of France ought to be considered and treated and watched in a very different manner from citizens of our own country." Annals of Congress, 5th Cong., 2d Sess. 1791. And just before the bill was ordered to be read for its third time, Mr. Gallatin pointed out that the Alien Act had already made it possible for the President to remove all aliens, whether friends or enemies; he interpreted the measure here under consideration, aimed only at alien enemies, as providing "in what manner they may be laid under certain restraints by way of security." For this reason he supported this bill. Annals of Congress, 5th Cong., 2d Sess. 2035.

German aliens could not now, if they would, aid the German Government in war hostilities against the United States. For as declared by the United States Department of State, June 5, 1945, the German armed forces on land and sea had been completely subjugated and had unconditionally surrendered. "There is no central Government or authority in Germany capable of accepting responsibility for the maintenance of order, the admin-

---

on the Alien Act, 1 Stat. 570, and the Sedition Act, 1 Stat. 596, both of which were passed within two weeks of the adoption of the Alien Enemy Act. These references appear in many places in the Annals of Congress, 5th Cong., 2d Sess. See *e. g.*, 1973–2028.

istration of the country and compliance with the requirements of the victorious Powers." And the State Department went on to declare that the United States, Russia, Great Britain, and France had assumed "supreme authority with respect to Germany, including all the powers possessed by the German Government, the High Command, and any state, municipal, or local government or authority." 12 State Dept. Bull. 1051. And on March 17, 1948, the President of the United States told the Congress that "Almost 3 years have elapsed since the end . . ." of the war with Germany. See Court opinion, n. 15.

Of course it is nothing but a fiction to say that we are now at war with Germany.[4] Whatever else that fiction might support, I refuse to agree that it affords a basis for today's holding that our laws authorize the peacetime banishment of any person on the judicially unreviewable conclusion of a single individual. The 1798 Act did not grant its extraordinary and dangerous powers to be used during the period of fictional wars. As previously pointed out, even Mr. Otis, with all of his fervent support of anti-French legislation, repudiated the suggestion that the Act would vest the President with such dangerous powers in peacetime. Consequently, the Court today gives the 1798 Act a far broader meaning

---

[4] The Court cites *Woods* v. *Miller Co.*, 333 U. S. 138, as having held that the war with Germany has not yet terminated. I find no such holding in the opinion and no language that even suggests such a holding. We there dealt with the constitutional war powers of Congress, whether all those powers are necessarily non-existent when there are no actual hostilities. Decision of that question has hardly even a remote relevancy to the meaning of the 1798 Alien Enemy Act. The Court today also seeks to support its judgment by a quotation from a concurring opinion in the *Woods* case, *supra*. But the concurring opinion cited was that of a single member of the Court.

than it was given by one of the most vociferous champions of the 1798 series of anti-alien and anti-sedition laws.

Furthermore, the holding today represents an entirely new interpretation of the 1798 Act. For nearly 150 years after the 1798 Act there never came to this Court any case in which the Government asked that the Act be interpreted so as to allow the President or any other person to deport alien enemies without allowing them access to the courts. In fact, less than two months after the end of the actual fighting in the first World War, Attorney General Gregory informed the Congress that, although there was power to continue the internment of alien enemies after the cessation of actual hostilities and until the ratification of a peace treaty, still there was no statute under which they could then be deported.[5] For this reason the Attorney General re-

---

[5] In a letter addressed to the Chairman of the House Committee on Immigration and Naturalization dated January 9, 1919, Attorney General Gregory explained that a number of German subjects who had "been interned pursuant to section 4067 of the Revised Statutes" [section 1 of the Alien Enemy Act of 1798] were still held in custody. He then stated:

"The authority given by the President to regulate the conduct of enemy aliens during the existence of the war, in my opinion, could not properly be used *at this time* to bring about the deportation of these aliens. There is now, therefore, no law under which these persons can be expelled from the country nor, if once out of it, prevented from returning to this country. I have, therefore, caused to be prepared the inclosed draft of a proposed bill, the provisions of which are self-explanatory." (Italics added.) H. R. Rep. No. 1000, 65th Cong., 3d Sess. 1-2. This position of the Attorney General that there then was no power under existing law to deport enemy aliens was reiterated by representatives of the Attorney General in hearings before the House Committee on Immigration and Naturalization on the bill enacted into law. Hearings on H. R. 6750, 66th Cong., 1st Sess. 3-21. In conformity with this interpretation of the 1798 Alien Enemy Act the Wilson administration did not attempt to deport interned alien

180

quested Congress to enact new legislation to authorize deportation of enemy aliens at that time. The bill thereafter introduced was endorsed by both the Attorney General and the Secretary of Labor in a joint letter in which they asked that it be given "immediate consideration" in view of the "gravity of this situation." Hearings before the House Committee on Immigration and Naturalization on H. R. 6750, 66th Cong., 1st Sess. 42–43. Several months later Attorney General Palmer submitted substantially the same statements to the House and Senate Committees on Immigration. H. R. Rep. 143, 66th Cong., 1st Sess. 2; S. Rep. 283, 66th Cong., 1st Sess. 2. See also Report of the Attorney General, 1919, 25–28.

A bill to carry out the recommendations of the Wilson administration was later passed, 41 Stat. 593 (1920), but not until it had been amended on the floor of the House of Representatives to require that all alien enemies be given a fair hearing before their deportation. 58 Cong. Rec. 3366. That a fair hearing was the command of Congress is not only shown by the language of the Act but by the text of the congressional hearings, by the committee reports and by congressional debates on the bill. In fact, the House was assured by the ranking member of the Committee reporting the bill that in hearings to deport alien enemies under the bill "a man is entitled to have counsel present, entitled to subpoena witnesses and summon them before him and have a full hearing, at which the stenographer's minutes must be taken." 58 Cong. Rec. 3373. See also 3367 and 3372. Congress therefore after the fighting war was over authorized the deportation of interned alien enemies only if they were

---

enemies under the 1798 Act after the Armistice and before Congress by statute expressly authorized such deportations as requested by the two Attorney Generals. Report of the Attorney General 1919, 25–28.

"given full hearing, as in all cases of deportation under existing laws." H. R. Rep. No. 143, 66th Cong., 1st Sess. 2.

This petitioner is in precisely the same status as were the interned alien enemies of the first World War for whom Congress specifically required a fair hearing with court review as a prerequisite to their deportation. Yet the Court today sanctions a procedure whereby petitioner is to be deported without any determination of his charge that he has been denied a fair hearing. The Court can reach such a result only by rejecting the interpretation of the 1798 Act given by two Attorney Generals, upon which Congress acted in 1920. It is held that Congress and the two Attorney Generals of the Wilson administration were wrong in believing that the 1798 Act did not authorize deportation of interned enemy aliens after hostilities and before a peace treaty. And in making its novel interpretation of the 1798 Act the Court today denies this petitioner and others the kind of fair hearing that due process of law was intended to guarantee. See *The Japanese Immigrant Case,* 189 U. S. 86, 100–101, read and explained on the floor of the House of Representatives at 58 Cong. Rec. 3373, read into the House Committee hearings, *supra* at 19–20, and quoted in part in note 2 of MR. JUSTICE DOUGLAS' dissenting opinion.

The Court's opinion seems to fear that Germans if now left in the United States might somehow have a "potency for mischief" even after the complete subjugation and surrender of Germany, at least so long as the "peace of Peace has not come." This "potency for mischief" can of course have no possible relation to apprehension of any invasion by or war with Germany. The apprehension must therefore be based on fear that Germans now residing in the United States might emit ideas dangerous to the "peace of Peace." But the First Amend-

ment represents this nation's belief that the spread of political ideas must not be suppressed. And the avowed purpose of the Alien Enemy Act was not to stifle the spread of ideas after hostilities had ended.[6] Others in the series of Alien and Sedition Acts did provide for prison punishment of people who had or at least who dared to

---

[6] As a justification for its interpretation of the 1798 Act the Court appears to adopt the reasons advanced by the Second Circuit Court of Appeals in *United States ex rel. Kessler* v. *Watkins,* 163 F. 2d 140, decided in 1947. That Court emphasized the difficulty of deportation of alien enemies during the time of actual hostility "because of the danger to the aliens themselves or the interference with the effective conduct of military operations." This reasoning would of course be persuasive if the object of the 1798 statute had been punishment of the alien enemies, but the whole legislative history shows that such was not the purpose of the Act. Hence the Act cannot be construed to authorize the deportation of an enemy alien after the war is over as punishment. Furthermore, the purpose of deportation, so far as it was authorized (if authorized) under the 1798 Act, was not to protect the United States from ideas of aliens *after* a war or threatened invasion but to protect the United States against sabotage, etc., *during* a war or threatened invasion. Nevertheless, the Circuit Court of Appeals thought that without its interpretation "the Executive would be powerless to carry out internment or deportation which was not exercised during active war and might be obliged to leave the country unprotected from aliens dangerous either because of secrets which they possessed or because of potential inimical activities." But after a war is over the only "inimical activities" would relate to peacetime governmental matters—not the type of conduct which concerned those who passed the Alien Enemy Act. Moreover, it is difficult to see why it would endanger this country to keep aliens here "because of secrets which they possess." And of course the executive is not powerless to send dangerous aliens out of this country, even if the 1798 Act does not authorize their deportation, for there are other statutes which give broad powers to deport aliens. There is this disadvantage to the Government, however, in connection with the other deportation statutes—they require a hearing and the executive would not have arbitrary power to send them away with or without reasons.

express political ideas.[7]   I cannot now agree to an interpretation of the Alien Enemy Act which gives a new life to the long repudiated anti-free speech and anti-free press philosophy of the 1798 Alien and Sedition Acts.   I would not disinter that philosophy which the people have long hoped Thomas Jefferson had permanently buried when he pardoned the last person convicted for violation of the Alien and Sedition Acts.

Finally, I wish to call attention to what was said by Circuit Judge Augustus Hand in this case speaking for himself and Circuit Judges Learned Hand and Swan, before whom petitioner argued his own cause.   Believing the deportation order before them was not subject to judicial review, they saw no reason for discussing the ". . . nature or weight of the evidence before the Repatriation Hearing Board, or the finding of the Attorney General . . . ."   But they added: "However, on the face of the record it is hard to see why the relator should now be compelled to go back.   Of course there may be much not disclosed to justify the step; and it is of doubtful propriety for a court ever to express an opinion on a subject over which it has no power.   Therefore, we shall, and should, say no more than to suggest that justice may perhaps be better satisfied if a reconsideration be given him in the light of the changed conditions, since the order of removal was made eighteen months ago."   163 F. 2d at 144.

It is not amiss, I think, to suggest my belief that because of today's opinion individual liberty will be less secure tomorrow than it was yesterday.   Certainly the security of aliens is lessened, particularly if their ideas happen to be out of harmony with those of the govern-

---

[7] See Bowers, Jefferson and Hamilton, 1925, c. XVI, "Hysterics," and c. XVII, "The Reign of Terror"; 1 Morison, Life of Otis, c. VIII, "A System of Terror."

mental authorities of a period. And there is removed a segment of judicial power to protect individual liberty from arbitrary action, at least until today's judgment is corrected by Congress [8] or by this Court.

Mr. Justice Douglas, with whom Mr. Justice Murphy and Mr. Justice Rutledge concur, dissenting.

I do not agree that the sole question open on *habeas corpus* is whether the petitioner is in fact an alien enemy.[1] That delimitation of the historic writ is a wholly arbitrary one. I see no reason for a more narrow range of judicial inquiry here than in *habeas corpus* arising out of any other deportation proceeding.

It is undisputed that in peacetime an alien is protected by the due process clause of the Fifth Amendment. *Wong Wing* v. *United States,* 163 U. S. 228. Federal courts will then determine through *habeas corpus* whether

---

[8] It is suggested in the Court's opinion that Congress by appropriating funds in 1947 to "return" alien enemies to their "bona fide residence or to such other place as may be authorized by the Attorney General" has already approved the Attorney General's interpretation of the 1798 Act as authorizing the present deportation of alien enemies without affording them a fair hearing. But no such strained inference can be drawn. Congress did not there or elsewhere express a purpose to deny these aliens a fair hearing after the war was over. Until it does so, I am unwilling to attribute to the Congress any such attempted violation of the constitutional requirement for due process of law.

[1] See *United States ex rel. Schlueter* v. *Watkins,* 67 F. Supp. 556, aff'd 158 F. 2d 853; *United States* v. *Longo,* 46 F. Supp. 170; *United States* v. *Uhl,* 46 F. Supp. 688, rev'd on other grounds, 137 F. 2d 858; *Ex parte Gilroy,* 257 F. 110; *Banning* v. *Penrose,* 255 F. 159; *Ex parte Fronklin,* 253 F. 984; *Minotto* v. *Bradley,* 252 F. 600. Cf. *Citizens Protective League* v. *Clark,* 81 U. S. App. D. C. 116, 155 F. 2d 290; *De Lacey* v. *United States,* 249 F. 625. In the *Schlueter* case it was held that the Constitution and the statute do not require a hearing and thus an alien enemy cannot complain of the character of the hearing he did receive. 67 F. Supp. at 565.

or not a deportation order is based upon procedures affording due process of law. *Vajtauer* v. *Commissioner,* 273 U. S. 103, 106. In deportation proceedings due process requires reasonable notice (*Tisi* v. *Tod,* 264 U. S. 131, 134), a fair hearing (*Bridges* v. *Wixon,* 326 U. S. 135, 156; *Chin Yow* v. *United States,* 208 U. S. 8, 12; *Low Wah Suey* v. *Backus,* 225 U. S. 460), and an order supported by some evidence (*Vajtauer* v. *Commissioner, supra,* p. 106; *Zakonaite* v. *Wolf,* 226 U. S. 272, 274). And see *Kwock Jan Fat* v. *White,* 253 U. S. 454.

The rule of those cases is not restricted to instances where Congress itself has provided for a hearing. *The Japanese Immigrant Case,* 189 U. S. 86, decided in 1903, so held. The Court in that case held that due process required that deportation be had only after notice and hearing even though there, as here, the statute prescribed no such procedure but entrusted the matter wholly to an executive officer.[2] Consistently with that principle we held in *Bridges* v. *Wixon, supra,* that a violation of the rules governing the hearing could be reached on *habeas corpus,* even though the rules were prescribed not by Con-

---

[2] The Court said, 189 U. S. p. 101: ". . . no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act. Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized."

gress but by the administrative agency in charge of the deportation proceeding. We stated, p. 154:

> "We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."

The same principles are applicable here. The President has classified alien enemies by regulations of general applicability and has authorized deportation only of those deemed dangerous because they have adhered to an enemy government, or the principles thereof. Petitioner was in fact given a hearing in 1945 before the Repatriation Hearing Board in addition to one in 1942 before the Alien Enemy Hearing Board. The order for his deportation recites that "upon consideration of the evidence presented" before those Boards, the Attorney General, in the words of the Proclamation, deems petitioner "to be dangerous to the public peace and safety of the United States because he has adhered to a government with which the United States is at war or to the principle thereof." Those findings and conclusions and the procedure by which they were reached must conform with the requirements of due process. And *habeas corpus* is the time-honored procedure to put them to the test.

The inquiry in this type of case need be no greater an intrusion in the affairs of the Executive branch of government than inquiries by *habeas corpus* in times of peace into a determination that the alien is considered to be an "undesirable resident of the United States." See

*Mahler* v. *Eby*, 264 U. S. 32.    Both involve only a deter-
mination that procedural due process is satisfied, that
there be a fair hearing, and that the order be based upon
some evidence.

The needs of the hour may well require summary
apprehension and detention of alien enemies.    A nation
at war need not be detained by time-consuming proce-
dures while the enemy bores from within.    But with an
alien enemy behind bars, that danger has passed.    If he
is to be deported only after a hearing, our constitutional
requirements are that the hearing be a fair one.    It is
foreign to our thought to defend a mock hearing on the
ground that in any event it was a mere gratuity.    Hear-
ings that are arbitrary and unfair are no hearings at all
under our system of government.    Against them *habeas
corpus* provides in this case the only protection.

The notion that the discretion of any officer of govern-
ment can override due process is foreign to our system.
Due process does not perish when war comes.    It is well
established that the war power does not remove constitu-
tional limitations safeguarding essential liberties.    *Home
Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 426.