# Presidential Powers Relating to the Situation in Iran

[The following memorandum was prepared in the hours immediately following the seizure of the United States embassy in Tehran. Its conclusions are set forth in its second paragraph.]

November 7, 1979

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum addresses, on an urgent basis, possible responses to the situation in Iran.

Our conclusions are as follows:

1) The President may block Iranian assets upon the declaration of a national emergency under the International Emergency Economic Powers Act (IEEPA). An oil boycott would be such an emergency. This Act also provides authority to halt transactions including imports and exports.

2) Without declaration of an emergency, the President may prohibit or curtail the export of goods in situations threatening American national security or stated foreign policy goals under the Export Administration Act of 1979.

3) The President may restrict the movement of Iranian diplomatic and consular personnel and may take non-forcible reprisals.

4) Except in time of war the United States cannot intern Iranian nationals.

5) The President has the constitutional power to send troops to aid American citizens abroad. This power is subject to the consultation and reporting provisions of the War Powers Resolution.

### I. Authority to Impose Economic Controls

*A. The International Emergency Economic Powers Act*

The President has wide-ranging power to regulate direct foreign investment under the International Emergency Economic Powers Act, Pub. L. No. 95–223, title II, 50 U.S.C. §§ 1701–1706 (Supp. I 1977), enacted in 1977.

The Act authorizes the President, after declaration of a national emergency, to block all assets in the United States of Iran and Iranian

115

nationals and to prohibit or regulate all importation or exportation of property in which Iran or Iranians have an interest.

The IEEPA provides in relevant part:

> Sec. 202. (a) Any authority granted to the President by section 203 may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.
>
> (b) The authorities granted to the President by section 203 may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this title and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.
>
> Sec. 203. (a)(1) At the times and to the extent specified in section 202, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) *investigate, regulate,* or *prohibit—*
>
> (i) *any transactions in foreign exchange,*
>
> (ii) *transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,*
>
> (iii) *the importing or exporting of currency or securities; and*
>
> (B) *investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;*
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §§ 1701, 1702(a)(1). (Emphasis added.) [1] It is clear that once the President declares a national emergency under the IEEPA, he

---

[1] The statute denies the President authority to regulate communications and most humanitarian activities. *Id.* § 1702(b).

assumes plenary control over all foreign assets subject to the jurisdiction of the United States, and he may regulate or prohibit movements of foreign or domestic currency or credit in and out of the country.

In the IEEPA, Congress (perhaps intentionally) left the definition of "national emergency" ostentatiously vague.[2] This may reflect either the difficulty of defining all possible situations which could constitute a national emergency or the recognition that what constitutes a national emergency is essentially a political question depending upon the felt necessities of a particular political context.

However, the legislative history indicates that an oil embargo could institute a national emergency.

During the markup of the bill in the Committee on International Relations, the following exchange between Representatives Solarz and Bingham, the latter being Chairman of the Subcommittee that considered the legislation, took place:

> Mr. Solarz. For argument sake, let us say there was another oil embargo. Would that constitute potentially the kind of nonwar national emergency?
>
> Mr. Bingham. I think quite clearly it would.
>
> Mr. Solarz. If it would, and the President declared a national emergency pursuant to such an embargo, could you explain in lay language what precisely he would be able to do under his powers? When it talks about regulating the controlling [sic] foreign assets, does that mean he could freeze the assets of the boycott [sic] of the country that established the embargo?
>
> Mr. Bingham. Correct, freeze but not seize. There is a difference.
>
> Mr. Solarz. So if he had money he could tie it up and say in effect when you lift the embargo, we will lift the freeze?
>
> Mr. Bingham. That is correct. He can regulate exports in a manner not regulated by the Export Administration Act.

---

[2] See H.R. Rep. No. 459, 95th Cong., 1st Sess. 10 (1977):

[G]iven the breadth of the authorities and their availability at the President's discretion upon a declaration of national emergency, their exercise should be subject to various substantive restrictions. The main one stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems. A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs.

117

Mr. Solarz. Which means he could in effect establish an embargo on exports to that country?

Mr. Bingham. Correct.

*Revision of Trading With the Enemy Act, Markup Before the House Comm. on International Relations,* 95th Cong., 1st Sess. 4 (1977).

Declaration of a national emergency under the IEEPA implicates provisions of the National Emergencies Act, Pub. L. No. 94-412, 50 U.S.C. §§ 1601-51. *See* H.R. Rept. No. 459 at 14 (1977). Section 204(d), 50 U.S.C. § 1703(d), provides that the consulting and reporting obligations placed on the President "are supplemental to those contained in title IV of the National Emergencies Act." And the National Emergencies Act states in no uncertain terms that "[n]o law enacted after the date of enactment of this Act shall supersede this title [concerning declaration of a national emergency and congressional power to terminate] unless it does so in specific terms, referring to this title, and declaring that the new law supersedes the provisions of this title." 50 U.S.C. § 1641. Thus, should the President declare a national emergency under the IEEPA arising out of an energy crisis, he must

> (a) transmit the declaration and a report justifying it to Congress and publish the declaration in the Federal Register (50 U.S.C. § 1703);
> (b) keep and transmit to Congress records of all executive orders, proclamations, rules, and regulations (*id.,* § 1641);
> (c) transmit to Congress every six months a report on expenditures directly attributable to the exercise of emergency authorities (*id.*);
> (d) report to Congress every six months actions taken in the exercise of the emergency authorities (*id.,* § 1703(c)).

Furthermore, the legislative veto provision of the National Emergencies Act, § 202(a)(1), applies to the President's declaration of a national emergency under the IEEPA; and § 207(b) of the IEEPA provides further that Congress may terminate the President's exercise of authority saved by IEEPA's grandfather clause, § 207(a)(1). President Carter noted his "serious concern" over the unconstitutionality of § 207(b) at the time he signed the IEEPA. Pub. Papers of Jimmy Carter 2187 (Dec. 28, 1977). We believe Congress may not constitutionally terminate the exercise of these authorities by passage of a concurrent resolution not submitted to the President pursuant to Article I, § 7 of the Constitution.

While the Act has not been used, the constitutionality of its predecessors has been upheld. *E.g., Nielsen* v. *Secretary of Treasury,* 424 F.2d 833 (D.C. Cir. 1970); *Pike* v. *United States,* 340 F.2d 487 (9th Cir. 1965); *Sardino* v. *Fed. Res. Bank,* 361 F.2d 106 (2d Cir.), *cert. denied* 385 U.S. 898 (1966).

## B. Export Controls

The new Export Administration Act of 1979 (Pub. L. No. 96–72, to be codified at 50 U.S.C. App. § 2401 *et seq.)* contains two separate grants of power to the President to prohibit or curtail the export of goods and technology that are subject to the jurisdiction of the United States. Both of these provisions state that the authority is to be exercised by the Secretary of Commerce by means of export licenses. The first provision, § 5(a), is meant to implement the Act's policy to restrict exports that "would make a significant contribution to the military potential of any other country . . . which would prove detrimental to the national security of the United States." (§ 3(2)(A)). The second provision is meant to implement the Act's policies to restrict exports "to the extent necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations," (§ 6(a)) a phrase that is apparently limited by an accompanying cross-reference to the Act's policies of securing removal of foreign restrictions on our supplies in certain circumstances, and of discouraging the provision of aid or sanctuary to international terrorists.

Either or both of these grants of power may prove responsive to the Iranian situation. The Act sets some substantive restrictions on presidential discretion that are not outlined above (e.g., he may not limit exports of medicines). It also includes complicated provisions for the Secretary to follow in issuing or denying licenses.

## II. Diplomatic and Consular Persons and Property

### A. Rights of Iranian Diplomats

The rights of diplomats are codified in the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502. The United States and Iran are both parties to the Convention.

Article 39 of the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, provides that privileges and immunities continue even in case of armed conflict. The United States opposed this provision because it would preclude custody in wartime, 7 M. Whiteman, Digest of Int'l Law 441, but did not enter a reservation to it. The State Department Legal Adviser expressed the view during hearings on the convention that Article 26, which permits regulation of the travel of diplomats for reasons of national security, would permit custody. *Id.* at 442. Thus, it might be possible to place their diplomats in a situation akin to house arrest under Article 26. However, they would be free to leave the country. Article 44.

This conclusion is reinforced by the fact that it appears that Iran has been guilty of massive breach of its obligation under the Convention to protect United States diplomats and diplomatic property. A material breach of a multilateral treaty by one of the parties entitles a party

specially affected by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part in the relations between itself and the defaulting state. Vienna Convention on the Law of Treaties, Art. 60, Senate Exec. L., 92d Cong., 1st Sess. (1971).

## B. Diplomatic Property

The Diplomatic Convention further provides that the host state must respect and protect the premises of the mission together with its property and archives even if diplomatic relations are broken off. On the other hand a violation of a treaty obligation, as of any other obligation, may give rise to a right "to take non-forcible reprisals." *Commentary on Vienna Convention on Law of Treaties*, [1966]. 2 Y.B. Int'l L. Comm'n 169, 253–54. We make no recommendation as to what an appropriate reprisal may be.

## C. Consular Offices

The Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, United States-Iran, 8 U.S.T. 899, T.I.A.S. No. 3853, provides for protection of consular officers (Art. XIII) and for the normal privileges and immunities. In addition, both the United States and Iran are parties to the subsequent Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820. The Consular Convention includes provisions for protection of consular posts comparable to those in the Diplomatic Convention (Arts. 26, 27, 34 and our observations would similarly apply.)

### III. Iranian Nationals

The President has statutory authority to intern or expel enemy aliens. However, this power is available only in time of war or invasion, 50 U.S.C. § 21, and thus cannot be invoked at present. The Supreme Court has held this provision constitutional. *Ludecke* v. *Watkins*, 335 U.S. 160 (1948).

The Supreme Court has also upheld the constitutionality of curfews and exclusion orders directed solely at persons of Japanese ancestry (including American citizens) during World War II, *Korematsu* v. *United States*, 323 U.S. 214 (1944); *Hirabayashi* v. *United States*, 320 U.S. 81 (1943). The court invalidated detention orders as beyond the statutory authority of the War Relocation Authority without reaching the constitutional issues. *Ex Parte Endo*, 323 U.S. 283 (1944).

These orders were authorized by a statute which was repealed in 1976. Section 501(e) of P.L. No. 94–412, the National Emergencies Act. No comparable statute exists today.

## IV. Use of Troops

*A. Constitutional Power*

It is well established that the President has the constitutional power as Chief Executive and Commander-in-Chief to protect the lives and property of Americans abroad. This understanding is reflected in judicial decisions, *e.g., Durand* v. *Hollins,* 8 Fed. Cas. 111 (No. 4186) (C.C.S.D.N.Y. 1860) quoted in The Constitution of the United States: Analysis and Interpretation 562–63 (1973), and recurring historic practice which goes back to the time of Jefferson. *E.g.,* Borchard, The Diplomatic Protection of Citizens Abroad 448–53 (1915). This power has been used conspicuously in recent years in a variety of situations. These include: landing troops in the Dominican Republic to protect the lives of citizens believed to be threatened by rebels (1965), the Danang sealift during the collapse of Vietnam defense (1975), the evacuation of Phnom Penh (Cambodia, 1975), the evacuation of Saigon (1975), the *Mayaguez* incident (1975), evacuation of civilians during the civil war in Lebanon (1976), and the dispatch of forces to aid American victims in Guyana (1978).

*B. The War Powers Resolution*

The War Powers Resolution, 50 U.S.C. § 1541 *et seq.,* does not limit the President's power to act in this instance. Its consultation and reporting requirements are, however, both triggered by situations which involve the introduction of armed forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated. *See* 50 U.S.C. §§ 1542, 1543.[3] In addition, reporting to Congress is also required by the Resolution when armed forces are sent to a foreign country equipped for combat, or when they are sent in numbers which substantially enlarge the forces equipped for combat already in a foreign nation. *See* 50 U.S.C. § 1543.

The Resolution includes in its statement of purposes and policy a list of situations in which the President is authorized to introduce the armed forces into hostilities or situations of imminent hostility. *See* 50 U.S.C. § 1541(c). Protection of American citizens abroad is not there mentioned. However, we do not consider that the purpose and policy statement should be construed to constrain the exercise of the President's constitutional power in this instance.

First, the Resolution's policy statement is not a comprehensive or binding formulation of the President's powers as Commander-in-Chief.

---

[3] There have been, since the enactment of the Resolution, four instances of protection and evacuation where its provisons applied. *See War Powers: A Test of Compliance Relative to the Danang Sealift, the Evacuation of Phnom Penh, the Evacuation of Saigon, and the Mayaguez Incident, Hearings Before the Subcommittee on International Security and Scientific Affairs of the House Comm. on International Relations,* 94th Cong., 1st Sess. (1975).

*See* H. Conf. Rep. 547 93d Cong., 1st Sess. 8 (1973) (stating that subsequent sections of the Resolution are not dependent on the policy statement). Moreover, Senator Javits, Senate Manager of the Conference Bill, when asked whether the President has "authority to act unilaterally to rescue American nationals in danger abroad who might be found in the midst of rebellion or the threat of war," replied:

> I think the normal practice which has grown up on that is that it does not involve such a utilization of the forces of the United States as to represent a use of forces, appreciably, in hostilities so as to constitute an exercise of the war power or to constitute a commitment of the Nation to war.

119 Cong. Rec. 33,558 (1973). In view of this "normal practice," it would seem that the failure in the Resolution's statement of purpose and policy to list the recognized Presidential power of protecting American citizens abroad is itself an indication that the list therein was not meant to be exhaustive.[4]

Finally, the Resolution itself disclaims any intent to alter the constitutional power of the President, such as has been discussed in this memorandum, *see* 50 U.S.C. § 1547(d)(1), and it probably could not.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[4] *See* Franck, *After the Fall: The New Procedural Framework for Congressional Control Over the War Power,* 71 Am. J. Int'l L. 605, 613, 626 (1977).